**CROWN CORK & SEAL COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**United Steelworkers of America, AFL–CIO, Intervenor.**

No. 92–1428.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 4, 1993.

Decided Oct. 7, 1994.

Alan D. Berkowitz, argued the cause for the petitioner. With him on the brief were Jerome A. Hoffman and Paul D. Snitzer. Frank J. Eisenhart, entered an appearance.

David A. Fleischer, Atty., N.L.R.B., argued the cause for the respondent. With him on the brief were Jerry M. Hunter, Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B.

Carol Burkett Hawkins, argued the cause for the intervenor. With her on the brief was Rudolph L. Milasich.

Before: MIKVA,* Chief Judge; WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Petitioner Crown Cork & Seal Company manufactures metal food and beverage cans at plants across the country, including one in Vineland, New Jersey.[1] In January 1990, the United Steelworkers of America started a unionization drive at the Vineland plant, but lost a Board-sponsored election on May 3, 1990 by a 16–13 vote. The Steelworkers filed unfair labor practice charges against

---

* Chief Judge MIKVA, a member of the panel when the case was argued, took no part in its disposition.

1. In July 1990, Crown acquired the Food Packaging Division of Continental Can Company, including the Vineland plant. Crown therefore became obligated as the successor employer to remedy any unfair labor practices committed by Continental. See *Golden State Bottling Co., Inc. v. NLRB,* 414 U.S. 168, 176–77, 94 S.Ct. 414, 421–22, 38 L.Ed.2d 388 (1973). We use "Crown" throughout to refer to the employer.

Crown, claiming that various activities by Crown in the campaign had violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1988). The Administrative Law Judge found, *Crown Cork & Seal Co.* ("ALJ Decision"), Joint Appendix ("J.A.") 502, and the Board agreed without adding analysis, *Crown Cork & Seal Co.*, 308 NLRB 445, 1992 WL 217941 (1992), that the company had made unlawful threats of plant closure, layoffs, and the elimination of a "Retirement Thrift Plan", and had committed four relatively minor illegalities as well. The Board therefore issued a bargaining order retroactively effective to February 22, 1990, the date of Crown's first alleged violation.

Crown contends here that the Board's conclusions are not supported by substantial evidence, as required under the National Labor Relations Act, 29 U.S.C. § 160(f) (1988), and the Administrative Procedure Act, 5 U.S.C. § 706(2)(E) (1988). See *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). We agree with Crown as to the Board's three principal conclusions, those relating to threats of plant closure, layoffs, and elimination of the Retirement Thrift Plan. Thus, we grant the petition and vacate the Board's findings as to those violations. Because the ALJ expressly rested the bargaining order on the *combination* of those supposedly illegal threats, J.A. 545, and because it would be impossible to sustain the bargaining order on the basis of the minor violations, we also vacate the bargaining order. See *Somerset Welding & Steel, Inc. v. NLRB*, 987 F.2d 777, 781 (D.C.Cir.1993) (where "violations the ALJ had considered '[c]entral to the *Gissel* issue'" were removed from consideration, other "coercive threats" by supervisors were not sufficient evidence to uphold bargaining order).

## I. Plant Closure and Layoff Threats

The Board found that an April 17, 1990 letter by John Bugnitz, the plant manager, constituted an illegal threat of both plant closure and layoffs, and that various other statements by Bugnitz and the regional manufacturing manager, James Toomey, constituted illegal threats of layoffs. We will discuss briefly the background shared by all these statements, and then turn to the plant closure and layoff findings in that order.

### A. Common Background

Until late 1989, Crown's Vineland plant had two three-piece can manufacturing lines, which produced can cylinders and separate top and bottom lids. Crown disassembled one three-piece line in December 1989 to make way for a new two-piece line, which produced cans with only a separate top. Crown planned to remove the remaining three-piece line from Vineland after the two-piece line became operational in March 1990.

As a result of this shift to two-piece technology, Crown no longer needed all 31 employees. Nevertheless, it retained all but its two most junior employees. Crown put many of those displaced to work on short-term maintenance and repair projects, because it hoped to create additional work at Vineland by developing two new projects. First, Progresso Foods, Crown's Vineland neighbor and principal customer, proposed installing a can-handling system in Crown's plant to be operated by Crown employees. Second, Crown contemplated moving an "end press", which makes lids, from its Hurlock, Maryland plant to Vineland. By late 1989, the company had tentatively decided to make the move.

During the three to five months before the unionization effort began, the company emphasized to the workers that the two hoped-for projects were necessary to maintain the current employment level and were cost-sensitive. As the ALJ found, John Bugnitz, the plant manager, held several "meetings with employees stressing the subject of 'job security' and 'cost'". J.A. 517. Bugnitz testified, without contradiction (and apparently without disbelief by the ALJ), that in the latter part of 1989, before the unionization drive began, he had explained to the employees that the reason for the proposed move of the end press was "that we were the cheapest place to manufacture those things". J.A. 232.

All of the 32 plants Crown operated in early 1990, with the exception of the Vineland plant and one other, were organized by labor unions. The Steelworkers represented

12 of the unionized plants, which were organized into a "single, multi-plant bargaining unit" with a Master Agreement establishing "uniform terms and conditions of employment" for all 12 plants. The Master Agreement had a provision automatically extending its terms to any new plants where the Steelworkers became certified or recognized. Thus, the company, the union, and the workers all knew in advance precisely what contract terms would apply if the Steelworkers became the representative at Vineland. These terms included wages that averaged about $16.50 an hour, as opposed to a $13.50 average under the status quo, as well as increases in other worker benefits. J.A. 132, 134. That unionization would increase costs at Vineland was *never in doubt.*

## B. Plant Closure

■ In January 1990, the union began an organizational campaign at the Vineland plant. By February 22, the Steelworkers had obtained authorization cards from 18 of the plant's 31 production and maintenance employees. On that day, the union circulated a flyer to the workers advocating unionization and raising—anticipatorily—the issue of job security:

> Naturally, the Company will resist organization, just as they always have, because your fair share takes away from their share. They will undoubtedly threaten lay offs and possibly even a plant closing.
>
> A non-union plant does not guarantee it's [sic] employees jobs. Just ask the laid off workers at Milton and Temple.

J.A. 441.

One of Crown's responses came in a letter dated April 17, 1990 (included in its entirety as Appendix A to this opinion) that reiterated the company's theme, developed long before the unionization drive, that there was a close link between low costs and the continued availability of jobs. Bugnitz asserted that because the can-handling and end-press projects were dependent on low costs, unionization would imperil them. "WE WILL NOT BRING WORK INTO THIS PLANT—AND OUR CUSTOMER WILL SEEK OTHER ALTERNATIVES—IF THAT WORK CAN'T BE DONE AT A REASONABLE COST, a cost that allows both of us to make a fair return on our investment." J.A. 457 (emphasis in original). The letter also included a passage seeking to impugn the union's record on job security:

> NOW LET'S LOOK AT THE STEEL-WORKERS' RECORD ON JOB SECURITY.
>
> *FACT NO. 1:* In 1970 the Steelworkers Union represented Continental Can employees under their master agreement at *45* locations. Today there are only *12* locations. Nearly 75% of the locations have been *CLOSED.* Plus another 17 locations were opened and then closed between 1970 and now. That's 50 plant closings in total. Those locations that exist today have even been cut way back.
>
> *FACT NO. 2:* In 1970, there were approximately 17,500 Continental Can employees working under the Steelworkers master agreement. More than *16,000* of those Continental Can employees (former USW members) have lost their jobs.

J.A. 458 (emphasis in original). The letter went on to emphasize that job security lay more in the company's flourishing than in unionization. "*NO* union can keep you employed and *NO* union can guarantee you a paycheck every week if we cannot provide our customers with the high quality products at competitive prices they have come to expect from us here at Vineland." J.A. 458.

In reaching his finding that this letter constituted an unlawful threat, the ALJ appears to have proceeded through the following steps: (1) The letter makes various predictions that amount to a claim that unionization was a frequent, and the *sole*, cause of plant closings. J.A. 530–31. (2) Viewed as predictions of this sort, the letter's assertions are unsupported. The record indicates that causes in addition to labor cost increases had played a role in the industry's succession of plant closures, causes that the Bugnitz letter failed to mention. Because of these omissions, the letter was "factually unbalanced". J.A. 531. (3) The references to plant closings must have been retaliatory, because any decision not to bring the end press to Vineland was "discretionary" and therefore not the

sort of circumstance that an employer may point to under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), as the basis for a prediction of the consequences of unionization. See J.A. 530–32.

■ The standards by which the letter is to be evaluated are set forth in *Gissel:*

> [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. See *Textile Workers v. Darlington Mfg. Co.*, 380 U.S. 263, 274, n. 20, 85 S.Ct. 994, 1001, n. 20, 13 L.Ed.2d 827 (1965). If there is any implication that an employer may or may not take action solely on his initiative *for reasons unrelated to economic necessities* and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

*Id.* at 618, 89 S.Ct. at 1942 (emphasis added). Thus, the Board may penalize two types of statements without encroaching on the employer's First Amendment rights. First, it may condemn a "threat of reprisal". Second, it may sanction at least some predictions of adverse economic consequences: predictions that may be understood by workers as threats, because they *suggest* that the action will occur not because of the ordinary operations of a market economy ("economic necessities"), but because the employer, for reasons of labor strategy, will seek to penalize concerted activity.

It is not altogether clear on which of these strands of *Gissel* the ALJ condemned the letter. Although he refers to the letter as a "retaliatory threat of 'close down' ", J.A. 531, the ALJ appears to have classified it as such largely because he construed it as a prediction with "no basis whatever". *Id.* In either event, the ALJ's approach disregards key elements in (1) the letter itself, (2) its context and (3) the principles set forth in *Gissel.*

(1) The letter cannot properly be read as threatening to close the plant in retaliation for unionization. In fact, the letter *expressly* states that job preservation is ultimately a matter of the plant's overall ability to produce a competitive product at competitive prices, and that this will be true *regardless of unionization*:

> In other words, your job security depends on our being able to provide Progresso with the best product and the best service at the best price. *Union or no union,* if we can continue to do that your job is secure. And—*union or no*—if we cannot continue to do that, your job is on [the] line. It's that simple.

J.A. 457 (emphasis added). This underscores the defensive character of the letter, its mission to blunt the union's effort to seize the job security issue as its own.

That the letter makes no threat to close the plant is confirmed by the one paragraph specifically directed to circumstances at Vineland:

> **THIS IS A CRITICAL TIME AT VINELAND.** Much is on the line, and much is up in the air. To protect jobs it will be necessary to move an end press to Vineland and assume all of Progresso's can handling work. *BUT,* those things can only occur IF we can carry out those operations efficiently and economically. IF NOT, THAT WORK WILL *NOT* BE DONE IN OUR VINELAND PLANT. IT WILL ONLY BE DONE HERE IF WE CAN MAINTAIN OUR COMPETITIVE ADVANTAGE. WE WILL NOT BRING WORK INTO THIS PLANT— AND OUR CUSTOMER WILL SEEK OTHER ALTERNATIVES—IF THAT WORK CAN'T BE DONE AT A REASONABLE COST, a cost that allows both

of us to make a fair return on our investment.

*Id.* (all forms of emphasis in original.) Again, management primarily sounds the themes of competition and consciousness of cost, as it had before the unionization drive began. In context, there is undoubtedly an implication that unionization would have adverse effects on cost. Given the Master Agreement and its guarantee of increases in wages and benefits, however, that implication was indisputably true.

In viewing the letter as a prediction (or set of predictions), the ALJ was driven to extreme terminological inexactitude. For example, he purported to paraphrase the letter as saying that "since 1970, there was a loss of 16,000 out of 17,500 jobs *because of* the master agreement." J.A. 530 (emphasis added). But while the letter obviously asserts an *association* between unionization and plant closings, it nowhere asserts that unionization is either a sufficient or a necessary cause of plant closings, and nowhere claims a one-to-one relation between the two. Rather, the implication is simply one of very substantially increased risk. Indeed, as we have seen, at crucial passages—especially the one directed to Vineland itself—the letter stresses the overall problem of maintaining a competitive position, "union or no union".[2]

The ALJ also said that the letter "adds" that the two much-sought projects "*are now not coming* into the plant *if the Steel Worker contract comes in.*" J.A. 529–30 (emphasis added). But the letter states no such thing. The letter sets forth data from which substantial risk may be inferred and asserts the existence of substantial risk; there is no warrant for transmuting these into assertions of certainties.

(2) Considered soberly for what they were, the letter's "predictions" were supported by

objective fact. The theme that unionization would diminish job security was in essence uncontested. At one point, the ALJ sought Bugnitz's assent to a summary of his testimony, asking, "Would it be fair to say, then, that labor costs themselves are a cause[ ], but not the only cause of layoffs and shut downs?" J.A. 202. Bugnitz agreed. Board counsel have not called our attention to a single word of evidence contradicting the proposition that wage increases—sure to follow from unionization because of the Master Agreement—were indeed among the causes of the wave of plant failures.

The ALJ was thus reduced to maintaining that the letter failed to "advise the employees that their jobs may lack security for reasons other than the advent of the Master Agreement", J.A. 531, such as "foreign competition, proximity to markets, new and advanced machinery, etc.", *id.*, and was thus "factually unbalanced". The charge is correct in the sense that the letter is not a thorough or sophisticated assessment of the causes of plant closures in the can-manufacturing industry in the 1970s and 1980s. But it does not purport to be. It implies that unionization under the Master Agreement has played a role in the ensuing plant closures, and the existence of such a role appears undisputed on this record. An assertion that one fact is a cause of a trend does not lack a "basis of objective fact", *Gissel,* 395 U.S. at 618, 89 S.Ct. at 1942, merely because there are other causes as well.

(3) The ALJ closed his analysis with a crucial third step, the one essential to drawing the line between permissible predictions and forbidden threats. Here he assumed that a prediction slides across the line into threat if the event predicted involves any *choice* on the part of the employer, *unless*

---

**2.** The ALJ also objected that because of the "two-piece" operation "there was *no anticipated plant closing*" even if Vineland did not secure the Progresso can-handling operation or the end press. J.A. 531. As the letter did not predict a plant closing, except in the sense of asserting increased risk, the ALJ's objection is perfectly true but perfectly beside the point. Furthermore, the "no anticipated plant closing" phrase appears to express an assumption by the ALJ that there was no risk that the Vineland plant might

close. There is no apparent basis in the record for such an assumption. The increase in wages and benefits prescribed in the Master Agreement could not have enhanced the plant's competitive position, and operation with only one two-piece line may well have sacrificed important plant-wide economies of scale. Moreover, the assumption cannot be squared with the plant's closure in June 1992 despite defeat of the union. See below at 23.

the choice is a matter of immediate survival (being "force[d] to the wall", as he said, J.A. 531). Thus, so far as "plant closing" was concerned, he concluded that because the movement of the end press to Vineland was a "discretionary" decision, not involving Crown's survival, it could not, under *Gissel,* be the basis for a prediction as to the consequences of unionization. *Id.* This analysis completely misconceives the *Gissel* inquiry, diverting attention from the question of whether the employer threatened retaliation or punishment for union activities into an assessment of how much profit an employer may be forced to forego (or how much loss it may be forced to incur). Because the ALJ repeated this analysis in his consideration of alleged layoff threats, we address it—the crux of both the "plant closing" and layoff charges—in that context. For the moment, we conclude that unless the ALJ's concept of "discretionary" acts is valid under *Gissel,* there is no basis for finding the April 17 letter an unlawful threat of plant closure.

## C. Layoffs

■ The ALJ rested his finding of layoff threats on the April 17, 1990 letter and on the following additional company statements.

On February 22, 1990, after the union had obtained authorization cards from 18 employees and had invited Vineland employees to an informational meeting at a nearby hotel, plant manager Bugnitz began a series of meetings with plant employees. At each meeting, only Bugnitz spoke; each time, he focused on the same issues. He told the employees that the can-handling and end-press projects were cost-sensitive and that if the plant were unionized, the projects might not materialize. He also said that without the projects, he could foresee the company retaining only sixteen employees.

Two to three weeks following these meetings, Bugnitz began convening weekly meetings with the employees, again stressing the possibility of losing the can-handling and end-press projects if costs increased due to unionization. Bugnitz told employees that transfer of the end press to Vineland was "on hold" pending the election, that the company was interested in Vineland as a site for the

project because of its cost advantages, and that implementation of the Master Agreement would eliminate those advantages.

Crown's regional manufacturing manager, James Toomey, delivered a speech to Vineland employees on April 25. Toomey emphasized the importance of maintaining competitive costs.

> We have now made a $3.6MM dollar investment in a *third technology* at Vineland and a tremendous amount of training again—a new state of the art two-piece DRD line—At how many plants have we made 3 technology changes?—Very few. I can think of one, and that is a plant like yours, non-union with competitive rates. I can assure you that if the cost of manufacture were higher, this project would be sitting on someone's desk collecting dust.

J.A. 482 (emphasis in original). Toomey further cautioned that "the two projects which you are aware of, the end press and the can center (which has been approved) are on hold pending the outcome of this election and will be, [sic] *re-evaluated* because they are very sensitive to increased costs." *Id.* (emphasis in original). Finally, Toomey stated his intention to monitor the upcoming election "very carefully" and predicted that Progresso would do the same. J.A. 484.

What do all of these statements suggest collectively? As in the April 17 letter, the company undoubtedly claimed that Vineland's acquisition of the end press and of the Progresso can-handling project might be affected adversely by the outcome of the vote. The ALJ framed the issue, quite properly under *Gissel,* as whether Crown's statements constituted "unlawful threats of layoff in retaliation for employees' union activities or were lawful predictions of the economic consequences of the high cost of unionization." J.A. 523.

In analyzing the matter, the ALJ ultimately rested his decision on the proposition that Crown's movement of the end press was a decision within its "discretion". He expressly found it unnecessary to classify Crown's statements as to the can-handling project (which was up to Progresso), J.A. 525, but referred repeatedly to Crown's power over

the end press. See, e.g., J.A. 526–27. His reasoning drew a critical distinction between what he supposed was a matter of management discretion and the sort of decision he would recognize as a product of competitive forces:

> Respondent threatens layoff solely because of the automatic application of the known high-cost Steel Worker contract which, because of a judgment on diminished profitability, will cause it not to transfer the end press. This latter *discretionary* act is *not* based on the workings of *outside competitive forces;* rather, it is based, on this record, on the Vineland plant's alleged resulting lack of competitiveness with Respondent's own unorganized sister plants.

J.A. 527 (emphasis added).

The same reasoning was critical to his conclusion that the April 17, 1990 letter constituted an illegal threat of plant closing. In that context he characterized Crown as saying that "its threats of layoff and closedown are bottomed, not on extravagant Union demands that will *force it to the wall,* but on obtaining '... a fair return on our investment'". J.A. 531 (emphasis added) (citation omitted). To the ALJ, this showed that the firm's decision over the end press was "discretionary—to be determined wholly by Respondent's estimate of a '... fair return.' An ensuing layoff or closedown, resting on such a foundation, would hardly be beyond Respondent's control, hardly an objective standard. A 'fair return' is a measure of Respondent's subjective desires." *Id.*

There is undoubtedly ambiguity in *Gissel*'s reference to circumstances beyond the employer's control, and it is worth looking again at the opinion's two key sentences:

> In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable *consequences beyond his control* or to convey a management decision already arrived at to close the plant in case of unionization. See *Textile Workers v. Darlington Mfg. Co.,*

380 U.S. 263, 274, n. 20, 85 S.Ct. 994, 1001, n. 20, 13 L.Ed.2d 827 (1965). If there is any implication that an employer may or may not take action *solely on his own initiative for reasons unrelated to economic necessities and known only to him,* the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

*Gissel,* 395 U.S. at 618, 89 S.Ct. at 1942 (emphasis added). According to the ALJ, Crown's expressed intention to pursue a "fair return" placed its statements beyond the pale defined by *Gissel.*

But to read *Gissel* in this manner is to impute to the Court a rather jejune grasp of the workings of a market economy. The ALJ would undoubtedly recognize that competition among firms, driven by investors' efforts to maximize their returns, draws resources to their most productive use. But the same investor effort to maximize returns drives managers to allocate resources *internally* to their most productive use. The fact that an identifiable manager, and not an invisible hand, makes these decisions (subject to sanction by the market if he or she makes them incompetently), does not mean that they are any less "economic necessities" or "beyond his control" in the sense those phrases are used by *Gissel.*

There are, of course, some differences. A single-plant firm that is unable to earn a competitive return will die, usually rather swiftly; it will be unable to attract capital, and the present owners, by definition, will be able to earn a better return elsewhere.[3] A multi-plant firm might for a time be able to use supra-competitive returns from some plants to subsidize operations at another. But unless the firm has some reasonable expectation of a turnaround, so that the loss at the declining plant (or profit below competitive rates) can be justified as an investment in expected future returns, such a program of internal subsidy would simply re-

---

**3.** The speed of the demise would seem to turn on how specific its capital is to the current activity (how "sunk" it is). If the capital is highly specific, the owners may find that considerable persistence will minimize their losses, while if its capital may be readily re-allocated to other activities, the firm will presumably do so promptly.

duce profit. There is no reason why a firm should pursue that course. It would make little sense, therefore, to construe *Gissel* as allowing the Board to ban speech that merely predicts company response to changed economic circumstances, so long as the action is one that a company completely free of retaliatory purpose would take.

In restricting speech, the Board operates in the shadow of a specific statutory provision intended to correct its practice in an earlier time, when, as Judge Friendly observed, "the Board condemned almost any anti-union expression by an employer." *NLRB v. Golub Corp.*, 388 F.2d 921, 926 (2d Cir.1967) (Friendly, J.). The congressional response was § 8(c), 29 U.S.C. § 158(c) (1988):

> (c) The expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

As § 8(c) limits the Board to sanctioning real threats of reprisal (including, of course, veiled ones), Judge Friendly understood it to direct attention to the motive of the employer (as inferred, to be sure, from words and context):

> Only if respondent's words contained a "threat of reprisal" did they go beyond the bounds of § 8(c). But, as the dictionaries tell us, a "threat of reprisal" means a "threat of retaliation" and this in turn means not a prediction that adverse consequences will develop but a threat that they will be *deliberately inflicted* in return for an injury—*"to return evil for evil."*

*NLRB v. Golub Corp.*, 388 F.2d at 928 (emphasis added).

*Golub* antedates *Gissel*, but later cases equally understand § 8(c) as permitting employers to say how the company is likely to respond to a changed economic environment (including changes that fall well short of threatening imminent bankruptcy), so long as the company's statements imply no punitive or retaliatory purpose. Included in Appendix B are employer statements that courts have, under this principle, found not to violate § 8(a)(1), statements all at least as menacing as Crown's and certainly no better supported. Explaining these outcomes, the Seventh Circuit said (for example): "To predict a consequence that will occur no matter how well disposed the company is toward unions is not to threaten retaliation; to predict a consequence that will occur because the company wants to punish the workers for voting for the union—a consequence desired and freely chosen by the company rather than compelled by economic forces over which it has no control—is." *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1367 (7th Cir. 1983).

Similarly, the Sixth Circuit has recently said that predictions about the adverse consequences of unionization are permissible where "nothing in the record demonstrates that the predicted consequences were driven by [the employer's] desire to punish employees for a pro-union vote." *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 369 (6th Cir.1993). See also *id.* at 371 (statement unlawful where it "conveys that the employer will act on its own initiative to punish its employees as the result of anti-union animus").

And in *Laborers' Dist. Council v. NLRB*, 501 F.2d 868 (D.C.Cir.1974), considering a series of cartoons with a large "closed" sign in front of the plant, where there was no empirical support for the proposition that unionization would in any way lead to closure, we said (upholding the Board's exoneration of the employer) that there was substantial evidence for the view that the sign did "not constitute a serious threat that the Company would close *in retaliation for a union vote." Id.* at 876 (emphasis in original); see also *id.* at 874 ("predictions or opinions will not violate the Act if they have some reasonable basis in fact and are in fact predictions or opinions and not veiled threats of employer retaliation"); *NLRB v. Intertherm, Inc.*, 596 F.2d 267, 277–78 (8th Cir. 1979) (employer's statement that he had shut down other plants for economic reasons in response to union demands was lawful because it contained no suggestion that company would close plants on its "own initiative for reasons unrelated to economic necessi-

ties") (quoting *Gissel*, 395 U.S. at 618, 89 S.Ct. at 1942).

Indeed, *Gissel*'s reference to "control" can be traced to *NLRB v. River Togs, Inc.*, 382 F.2d 198 (2d Cir.1967), which *Gissel* quotes for the standard "that an employer is free only to tell 'what he reasonably believes will be the likely economic consequences of unionization that are outside his control,' and not 'threats of economic reprisal to be taken solely on his own volition'". 395 U.S. at 619, 89 S.Ct. at 1942 (citing *River Togs*, 382 F.2d at 202). Applying that standard, *River Togs* overturned a Board decision finding a violation where the employer had pointed out that most of the workers earned far less in piece work than they would under the union minimum, and then "asked several employees to tell their experience in union shops; they reported these had closed down." *Id.* at 201. *River Togs* also cites Derek Bok, "The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act," 78 Harv.L.Rev. 38 (1964), arguing that the employer should be free to point out the hazards of unionization "so long as the consequences he mentions are *ones which may actually and lawfully take place* if the union is voted in." *Id.* at 79 (emphasis added). Thus, unless a decision by Crown not to bring the end press to Vineland because of a large wage hike there would be illegal—which even the ALJ did not claim—it is hard to see why the company's "control" over the matter (meaning simply that the company could make the opposite decision without necessarily being immediately driven "to the wall") should doom its allusion to the risk of reduced job opportunities.

Indeed, our own decision in *Laborers' District Council* addressed a letter alluding to "what has happened at Seabrook", which, as we explained, involved the employer's transfer of work from its unionized plant to a non-union plant after the imposition of union work restrictions. See 501 F.2d at 871–72 n. 11 (text), 875 (analysis). (See Appendix B for relevant segments of letter.) Although the transfer was presumably under the firm's control, we evidently did not think that even worthy of mention in our decision affirming the conclusion that there was no § 8(a)(1)

violation, nor did we suggest there was any need to show that the work rules "force[d the company] to the wall."

To read *Gissel* as condemning any prediction of a standard company response to increased prices—a reduction in use of the input whose price is to be increased—would entangle the Board in management decisions to a degree that appears incompatible not only with § 8(c) but also with the basic idea of the National Labor Relations Act: Rather than decide on substantive allocations of wealth as between labor and management, Congress sought to create a procedure through which they could bargain their way to results consistent with market realities. See Archibald Cox, "The Duty to Bargain in Good Faith," 71 Harv.L.Rev. 1401, 1407–09 (1958). Thus, *Gissel*'s statement that the Board may condemn predictions of actions the employer may take "solely on [the employer's] initiative for reasons unrelated to economic necessities and known only to him," 395 U.S. at 618, 89 S.Ct. at 1942, cannot mean that reference to ordinary market responses to increased prices is forbidden in all cases (as behavior "unrelated to economic necessities")—or even that it is forbidden except when the response is needed to avert immediate extinction (being "force[d] to the wall"). J.A. 531.

The ALJ also misconceived which "objective facts" were pertinent. He asserted that Crown "allude[d] only to the high-cost Master Agreement but ... provided no objective facts supporting Vineland's uncompetitive status compared to its sister plants". J.A. 528. See also J.A. 527 (asserting that "there is nothing in the facts herein to demonstrate what the wage scales, benefits, total costs, and efficiency of those unorganized sister plants consist of"). In fact, the record contained unquestioned evidence that the wage scale under the Master Agreement was more than 20% higher than at Vineland (a $16.50 average as opposed to a $13.50 average), not counting the extra fringe benefits. And before the union appeared on the scene at all, management had told the Vineland employees that the firm was inclined to move the end press to Vineland because "we were the cheapest place to manufacture those things".

J.A. 232; see also J.A. 524 (ALJ accepts Crown's evidence about prior statements of need to keep costs down at Vineland to attract new business). Vineland's loss of the chief source of its appeal would obviously reduce its chances of securing the end press or, for that matter, any other investment. The truth of that point does not turn on a comparison of absolute cost among different plants, but rather on prospective changes in cost at the Vineland plant—changes that the record showed would inevitably result from the Master Agreement.[4]

*Gissel* assures us that "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board." 395 U.S. at 617, 89 S.Ct. at 1941. If the Board may take management statements that very emphatically assert a risk, twist them into claims of absolute certainty, and then condemn them on the ground that as certainties they are unsupported, the free speech right is pure illusion. To be sure, Crown could have expressed the probable impact of the Master Agreement on Vineland's prosperity more cautiously. But if unions are free to use the rhetoric of Mark Antony while employers are limited to that of a Federal Reserve Board chairman, again the employer's speech is not free in any practical sense.

\* \* \*

Accordingly, the Board's findings of illegal threats of plant closure and layoffs are not supported by substantial evidence.

## II. The Retirement Thrift Plan

■ At the time of the unionization drive, the company's retirement package included a pension plan and a Retirement Thrift Plan ("RTP"). The Master Agreement, by contrast, provided a pension plan only. Sometime in April 1990, Bugnitz sent a memo to all Vineland employees answering employee questions about the relation between the Master Agreement and the RTP. See J.A.

456. In response to an inquiry about whether employees would keep all benefits they already had if they chose the union and came under the Agreement, the memo declared:

> Absolutely not. If the union wins the election, you would get exactly what is in the agreement, no more! If you have something that is *not* in the agreement, *YOU LOSE IT.* If you now have something that is *better* than the agreement, it gets reduced to what is in the agreement.

> That's exactly what happened at Lancaster in 1986 when the employees voted in the Steelworkers. The Lancaster employees *LOST* the right to participate in the Company's Retirement Thrift Plan. . . .

J.A. 456. In addition, on April 5, Lynne Krueger, Crown's employee relations manager from its Rochelle Park, New Jersey, office, conducted a meeting, together with Bugnitz, in which she presented a slide show and a document which both concluded with the statement that if the union won the election, "[f]uture participation [in the RTP] would be discontinued immediately." J.A. 455.

The ALJ characterized these assertions as an illegal threat, made without an adequate basis in fact. He regarded the Master Agreement as unambiguously providing for continuation of the Vineland RTP, so that he felt no need to consider the evidence as to the parties' actual interpretation of the Master Agreement. Thus he completely ignored the uncontroverted fact that, on the three prior occasions when the Agreement had been applied to a newly unionized Crown plant with a preexisting RTP, the benefit had been dropped without a word of protest from the Steelworkers. J.A. 137–39.

The pertinent provisions of the Master Agreement read as follows:

> 4.2. Presently effective local customs or practices, written or oral, which are not specifically covered by provisions of this Agreement and which are not in conflict

---

**4.** The court in *Pentre Electric* construed *Gissel* to make the characterization of an employer statement turn not on the employer's ability to verify it as an empirical matter but on the phrasing of the statement—contrasting objective statements of economic consequences with subjective state-

ments manifesting the employer's intent "to punish". 998 F.2d at 371. The issue need not be reached here, for the record amply supports the veracity of management's argument that a sharp wage hike at Vineland would reduce the chances of the end press being moved there.

with its provisions shall remain in effect during the term of this Agreement.

4.3. Presently effective local customs or practices, written or oral, which provide benefits in excess of the specific benefits provided for through the provisions of this Agreement shall be continued for the term of this Agreement unless eliminated by mutual agreement.

J.A. 327.

All parties agree that we read the Agreement without any "particular deference" to the Board's view of it, *Wilson & Sons Heating and Plumbing,.Inc. v. NLRB*, 971 F.2d 758, 760 (D.C.Cir.1992); see also *Litton Financial Printing v. NLRB*, 501 U.S. 190, 202–03, 111 S.Ct. 2215, 2223–24, 115 L.Ed.2d 177 (1991), here reflected solely in the ALJ's findings.

The ALJ read § 4.2 as providing for "the continuation of local customs and practices not in the Master Agreement" "nor in conflict with it", and § 4.3 as ensuring the continuance of "excess specific benefits". J.A. 538. In other words, §§ 4.2 and 4.3, taken together, imply (in his view) that all preexisting benefits not inconsistent with the terms and conditions of the Master Agreement are retained, including those in excess of specific benefits provided by it. The only preexisting benefits not retained are those covered by the Master Agreement, but that are less generous. If intended, such a meaning could surely have been expressed more directly.

Crown offers an alternative reading that stresses § 4.3's explicit reference to "benefits", which is missing from § 4.2. Crown reads § 4.3 as the exclusive ·provision on benefits, and argues that it continues them if, but only if, they (1) match specific benefits provided in the Master Agreement, and (2) are more generous. Stingier benefits, or ones not tracking those of the Master Agreement, are by implication dropped. Thus the RTP would end, since it does not track any benefit of the Master Agreement.

Unless Crown's view is unambiguously wrong—and, given the document's apparent waste of words in the ALJ's view, Crown's seems at least as strong a contender—the evidence of the parties' actual interpretation

in the past is highly relevant. See, e.g., *United Mine Workers v. Bituminous Coal Operators' Ass'n*, 898 F.2d 177, 181 (D.C.Cir. 1990). Here, in each of the three known cases .where a plant with an RTP was brought under the Master Agreement, Crown had dropped the RTP without protest from the union.

As the terms of the contract are ambiguous, and the evidence of past practice supports Crown's reading as clearly as such evidence can, the company's prediction of termination was a "reasonable" one "based on available facts", *Gissel*, 395 U.S. at 618, 89 S.Ct. at 1942, and cannot be the basis of an unfair labor practice.

### III. The Minor Violations

■ .Aside from the three violations on which he based the bargaining order, the ALJ also found four relatively minor unfair labor practices. In brief, these were:.

1. *Bugnitz's allegedly coercive interrogation of Merkt.* On the morning of February 22, an employee gave Bugnitz a copy of a letter from "The Committee for Union Representation" inviting Vineland employees to an informational meeting at a nearby hotel on February 25. Within a few hours, Bugnitz summoned Carl Merkt, the plant's most senior employee, to his office to question him about the letter's contents and the identity of "the committee for· union representation." J.A. 507–08.

·2. *Bugnitz's allegedly coercive statements about employee disloyalty.* During the course of the above conversation with Merkt, Bugnitz complained that the decision of the employees to seek union representation was a direct reflection on his managerial ability. Despite Merkt's avowals that it was nothing personal, Bugnitz repeatedly stated that he was upset that the employees had not brought their problems to him. Furthermore, witnesses testified that in the meetings Bugnitz. conducted in the weeks following February 22, Bugnitz took a "personal view" of the union drive and "took it as a reflection upon himself." He also claimed that the drive was not "fair" and that "this was all done behind his back." J.A. 519–20.

3. *Bugnitz's allegedly coercive interrogation of Miller.* In late April, about a week before the Board election, Bugnitz told an employee, Gary Miller, that if Miller had "any questions or concerns that he needed answers to regarding the organizing drive", he should speak to Supervisor Dominick Ciuffetelli or Supervisor John Julian. He noted that Miller had worked with Julian for a long time and could trust him; Julian had done Miller some favors. Miller told Bugnitz that he would talk to Julian. A few days later, Bugnitz asked Miller whether he had spoken to Julian. Miller replied that he was tired of being asked what he would do about the union and that he wanted to be left alone. J.A. 510–11.

4. *Bugnitz's alleged "statement of intent to retaliate".* The ALJ credited testimony by Merkt (though denied by Bugnitz), that on May 2, Bugnitz approached Merkt while he was working and said to him, "If the Union gets in, you're going to be responsible for a lot of people losing their jobs". Merkt yelled back angrily, "That's not true." The two then walked away from each other. J.A. 512.

We do not pass on the company's contentions that these four episodes could not properly be found unfair labor practices. The closure of the Vineland plant in June 1992 appears to render moot any remedy other than the bargaining order, which in effect would require the company to pay Master Agreement wages and benefits retroactively. See Respondent's Brief at 44–45 (pointing out that no election, fair or unfair, can now be held at the Vineland plant). Yet the four episodes, assuming they were unfair labor practices, could not reasonably support such an order.

The only episode that the ALJ even considered as remotely possible support for the bargaining order was Bugnitz's May 2 statement to Merkt. The Board argues in its brief that this statement was unaccompanied by any economic analysis and thus can properly be viewed as a pure statement of intent to retaliate. See Respondent's Brief at 23. The ALJ similarly branded the statement a "plain, old fashioned statement of retaliation against employees because of Merkt's pro-tected union activities." J.A. 513–14. But the record plainly developed an overall context—a litany of company statements attempting to show employees that the wage increases ineluctably tied to the Master Agreement would weaken the plant's comparative ability to secure the end press or the can-handling project. Given that company theme, we doubt that this single remark, without evidence of some alternative context setting it apart from the company's prevailing message, could be so classified.

■ In any event, the ALJ specifically found that these four episodes could not support a bargaining order. "I do not believe that the solitary instances of interrogation and Bugnitz' single emotional threat of May 2 to Carl Merkt are supportive of a bargaining order." J.A. 545. His legal conclusion in that respect is clearly correct. A "bargaining order is not a snake-oil cure for whatever ails the workplace; it is an 'extreme remedy' that must be applied with commensurate care." *Avecor, Inc. v. NLRB,* 931 F.2d 924, 938–39 (D.C.Cir.1991). Even the Board, arguing that remand rather than reversal of the bargaining order is appropriate if the court should set aside *one* of its principal findings of unlawful threats, argues only that the other *principal* findings might yet support the order. Respondent's Brief at 40 n. 8.

Moreover, even if one were to accept the Board's contention that the subsequent closure of a plant justifies a bargaining order because closure precludes other remedies, *id.* at 43–44, one would, at a minimum, have to find that the unfair labor practices could have shifted the election outcome. Because the Board could not realistically make any such finding as to these four minor episodes, they ·cannot support the bargaining order, and we find it unnecessary to pass on them.

## IV. Conclusion

The Board added no reasons of its own to the ALJ's, see 308 NLRB 445, and in argument here has suggested no alternative bases for upholding the findings of illegal threats of plant closure, layoffs, and elimination of the RTP. There is therefore no apparent basis

for a remand to the Board. *Chemical Manufacturers Ass'n v. EPA*, 28 F.3d 1259, 1268 (D.C.Cir.1994) ("No remand for further administrative proceedings is warranted because the EPA did not suggest in the rulemaking under review that there is any alternative basis in the record for including MDI on the high risk list."). Accordingly, we vacate the findings of § 8(a)(1) violations based on supposed threats of plant closure, layoff, and benefit termination, as well as the bargaining order that rests upon those findings.

*So ordered.*

### Appendix A

**CONTINENTAL FOOD PACKAGING**
Division of Continental Can Company, Inc.

---

April 17, 1990

Dear Fellow Employee:

In just three weeks—on May 3rd—you will make an important decision. You will decide whether or not you want to turn over control of *your future* to the Steelworkers Union and to people at *other* Continental Can plants.

As we have said, we believe there are *many* reasons you should say *"NO"* to the Steelworkers Union. One of the most important reasons is—*JOB SECURITY.*

Job security is a very important issue right now in our plant. With all of the changes taking place—the new technology and change to two-piece, the potential of the can handling system, and the possibility of moving an end press to our plant—everyone is concerned about job security. WILL THERE BE MORE JOBS? WILL THERE BE FEWER JOBS? WHAT WILL HAPPEN TO *YOUR* JOB?

In a campaign like this, the Steelworkers Union will try to convince you that the Union can provide you greater job security. But, you must keep one *FACT* in mind; NO UNION CAN GUARANTEE YOUR JOB SECURITY.

*No* union can provide job security. Job security comes from only one place—our customers. Your job security comes from the ability of the Vineland plant to provide a high quality product, on time, at a price Progresso is willing to pay. In other words, your job security depends on our being able to provide Progresso with the best product and the best service at the best price. Union or no union, if we can continue to do that your job is secure. And—union or no—if we cannot continue to do that, your job is on line. It's that simple.

**THIS IS A CRITICAL TIME AT VINELAND.** Much is on the line, and much is up in the air. To protect jobs it will be necessary to move an end press to Vineland and assume all of Progresso's can handling work. *BUT,* those things can only occur IF we can carry out those operations efficiently and economically. IF NOT, THAT WORK WILL *NOT* BE DONE IN OUR VINELAND PLANT. IT WILL ONLY BE DONE HERE IF WE CAN MAINTAIN OUR COMPETITIVE ADVANTAGE. WE WILL NOT BRING WORK INTO THIS PLANT—AND OUR CUSTOMER WILL SEEK OTHER ALTERNATIVES—IF THAT WORK CAN'T BE DONE AT A REASONABLE COST, a cost that allows both of us to make a fair return on our investment.

DO NOT BE DECEIVED INTO BELIEVING YOUR JOB IS SECURE. Although some people feel we are "locked in" at our plant, that is simply *not* true. If we can't do the job, believe me someone else *can* and *will* step in to take that work away from us.

NOW LET'S LOOK AT THE STEELWORKERS' RECORD ON JOB SECURITY.

*FACT NO. 1:* In 1970 the Steelworkers Union represented Continental Can employees under their master agreement at *45* locations. Today there are only *12* locations. Nearly 75% of the locations have been *CLOSED.* Plus another 17 locations were opened and then closed between 1970 and now. That's 50 plant closings in total. Those locations that exist today have even been cut way back.

*FACT NO. 2:* In 1970, there were approximately 17,500 Continental Can employees working under the Steelworkers master

agreement. More than *16,000* of those Continental Can employees (former USW members) have lost their jobs.

Could the Steelworkers Union save the jobs of those 16,000 Continental Can employees? The answer is clearly *"NO"*.

IF the Steelworkers could not provide job security for the thousands of employees they already represented, how can they possibly provide job security for you? *It can't.*

If the Steelworkers could not provide job security for the *hundreds of thousands* of Steelworkers members who used to be covered by master contracts at other companies in other industries, how can they possibly provide job security for you? *It can't.*

My point is simply this: *NO* union—and certainly not the Steelworkers Union—can provide jobs or job security. *NO* union can keep you employed and *NO* union can guarantee you a paycheck every week if we cannot provide our customers with the high quality products at competitive prices they have come to expect from us here at Vineland.

We are all working extremely hard to put new additional work into our plant. As we have said our job security depends on that work. As long as we can continue to attract that work our jobs are secure. But if anything interferes with our ability to compete for that work—that's it.

I personally believe this is one of the most important reasons that it is in your best interest to *VOTE "NO"* on May 3rd.

Sincerely,

John Bugnitz
Plant Manager

P.S. When the Steelworkers Union talks to you about job Security, ask them what job security they provided for the employees of Continental Can (Steelworkers Union members) at the 50 plants on the enclosed list.

*Appendix B*

(Texts of management statements upheld.)

*Laborers' Dist. Council of Georgia v. NLRB,* 501 F.2d 868 (D.C.Cir.1974):

> Several people have asked why we are against the Union. We are against the Union because we know they can wreck the Company and reduce the number of jobs. We have all seen what has happened at Seabrook. We don't want that here. We don't know of a single plant where more jobs have been created by a union. We don't know a single customer that the Union can get us. We do know of some customers we would lose if the Union caused us to up our prices.
>
> Mr. Bartlett doesn't care about layoffs. Union dues are only paid by the people working. Mr. Bartlett can't create any jobs.
>
> His union has lost so many elections in Georgia this year they are desperate for new members. Don't be misled by false promises. We are going to continue to manage this business—Protect Your Future—Vote *"NO."*

*Id.* at 872 n. 11.

The court summarized a cartoon distributed by management:

> This cartoon depicts three characters: "Preston," the Company president; "You," the employee; and "Big Daddy" Bartlett, the Union organizer. The dialogue reads as follows:
>
>> Once there were two people who worked together to build a successful business. They were pretty happy until a stranger (*who didn't work to build anything*) said to one ...
>>
>> "You poor exploited so and so! You're not getting enough from the business!" "Just sign this card and I'll help you make him give you more."
>>
>> *"Then lets you fight him,"* he said happily ...
>>
>> "If it doesn't work out *I* haven't lost anything."
>>
>> *YOU stand to loose,* [sic] *not "BIG DADDY"*

There is a picture of a building, presumably representing the plant with a sign on it reading "Closed".

*Id.* at 872 n. 13.

*NLRB v. Village IX, Inc.,* 723 F.2d 1360 (7th Cir.1983):

> Unions do not work in restaurants.... The balance is not here.... If the Union exists at Shenanigans, Shenanigans will fail. That is it in a nutshell.... I won't be here if there is a Union within this particular restaurant. I am not making a threat. I am making a statement of fact.... I respect anyone who wants to join the Union if that in essence is a workable place and can afford to pay Union wages. We can't in the restaurant business.

[The court speaking] He said the only restaurant in Decatur that was unionized was struggling, and if Shenanigans raised its prices in order to pay union wages its customers would switch to the nonunion restaurants, whose prices would be lower. He added:

> Shenanigans can possibly exist with labor problems for a period of time. But in the long run we won't make it. The cancer will eat us up, and we will fall by the wayside. And if you walk into this place five years down the road, if there is a Union in here, then I guarantee you it won't be a restaurant. I don't know what it will be. But wherever you people will be working in this town, in Decatur, it will not be in a Union restaurant. It will be in a non-Union restaurant, because there is a Union in town, it's at the Sheridan, and I think they only use one or two waitresses during the week and maybe three on the weekends. And you get Union wages, and I doubt if you get hardly any tips.
>
> I am not making a threat. I am stating a fact. When you are dealing with the Union you had better consider the pros and cons. I am sure there is a lot of pros that are involved. I haven't looked into them in that great of detail because this is my first experience with them. I only know from my mind, from my heart and from my pocketbook how I stand on this.

And I don't like the idea of looking at a Union as far as my employees are concerned.

*Id.* at 1364.

*NLRB v. Pentre Elec., Inc.,* 998 F.2d 363 (6th Cir.1993):

[Testimony by manager of what he had said.]

> ... [W]hat I was doing was establishing that all of our customers—all ... large customers were almost strictly open shop companies, some, of course, did do work with unions. And I said, "That's fine," I said, "That simply means that they're free enterprise and so am I."
>
> But, for the most part, it was open shop and some of our very good companies were very involved in the open shop industry, so to speak, like, associations and the like.
>
> So, it would be difficult to maintain those particular customers if we were a union contractor and then if we were a union contractor, we'd have to establish new customers.

[The court speaking] Meehan then testified that he told the employees, "I really don't want to go through that again, that's exactly where I was seven years ago, when we started Pentre Electric, was, you know, trying to knock on doors, get cold calls and establish the company and I'm not prepared to do that again." According to his testimony, Meehan then explained the nature of their current contracts with customers and the effect that the union could have on those contracts.

. . . .

[The court speaking] To support his finding that Luff's speech constituted an unfair labor practice, the administrative law judge characterized Luff's testimony as containing the following statement:

> [W]e would not have the same customer base if we went union. I don't know how we would go about getting another customer base. I'm certain that Pat [Meehan] and I would probably succeed—we're too young to quit, but. . . . we would not have the jobs we have now if we had been union

[and] it would be very difficult to get work if we were union.

*Id.* at. 367.

*NLRB v. Intertherm, Inc.,* 596 F.2d 267 (8th Cir.1979):

As I said, there is no magic in unions. If a company is competitive, if it manufactures a good product in an efficient and productive way, there is going to be job security whether you have a union or whether you do not. I have dealt with a number of unions in which I have had to shut down plants, or move them elsewhere. I've sat at the bargaining table and told an international union that you'll either have to agree to the company's position or we'll shut the plant down. They didn't believe me and we shut the plant down. These are not threats, these are simply facts showing what I think all of you really understand. Whether you have a union or whether you do not have a union, a company must remain competitive and it must grow if it is going to succeed.

*Id.* at 277–78.