NATIONAL STEEL AND SHIPBUILD-
ING COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Shipwrights, Boatbuilders & Helpers,
Carpenters Local No. 1300, et
al., Intervenors.

No. 97–1689.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 9, 1998.

Decided Oct. 2, 1998.

Van A. Goodwin, San Diego, CA, argued the cause for petitioner. With him on the brief was William C. Wright.

David Habenstreit, Supervisory Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, Washington, DC, and Vincent J. Falvo, Jr., Attorney, Utica, NY.

David Rosenfeld and Stanley S. Mallison were on the brief for intervenors Shipwrights, Boatbuilders & Helpers, Carpenters Local No. 1300, et al.

Before: EDWARDS, Chief Judge, GINSBURG, and ROGERS, Circuit Judges.

GINSBURG, Circuit Judge:

The National Labor Relations Board determined that National Steel and Shipbuilding Co. (NASSCO) violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), when it videotaped its employees engaging in protected labor activities. The Board ordered the company to cease and desist from using, or conveying the impression that it is using, video and audio devices to record protected activities. NASSCO petitions for review, arguing that the Board lacks substantial evidence to support its conclusions, and the Board cross-petitions for enforcement of its order. We deny the petition for review and enforce the Board's order in full.

I. Background

NASSCO, which builds and repairs ships for the Navy and others, employs approximately 3,000 people in an enclosed industrial

complex. Most employees enter the complex through Gate 6, which borders a large parking lot. Although the lot is on NASSCO's property, the Company has historically permitted the seven unions that represent its employees to hold rallies there. Nearby stands a shack staffed by three or four guards with a full view of activity in the lot and at Gate 6. NASSCO also has a system of security cameras monitoring its property, including two that cover the lot near Gate 6.

NASSCO and the unions have a history of labor disputes, including strikes in 1980, 1984, 1988, and 1992, as well as an eleven-month period from 1987 to 1988 during which employees worked without a contract. The most recent strike began after the expiration of the collective bargaining agreement in September, 1992 and ended three weeks later, when NASSCO and the seven unions executed a "return to work" agreement. When that agreement expired in February, 1993, the two sides still had not reached agreement on a new contract and NASSCO unilaterally implemented its final offer. The unions decided not to strike, but instead to work without a contract and, as in 1987–1988, to pursue a so-called "inside game." Their strategy was to put pressure on the Company while the employees remained on the job, thereby avoiding the risk of replacement that attends a strike. Pursuant to this strategy, the unions held rallies in front of Gate 6 each morning at 6 a.m., before the morning shift change.

In order to videotape these rallies, which typically attracted about 100 employees, NASSCO's chief of security, Eugene Hutchins, placed a tripod-mounted camera atop Building 15, a two-story structure adjacent to Gate 6. The videotaping lasted from February through May, 1993. Additionally, NASSCO stationed Woody Breece, an industrial relations staff member, in the shack near Gate 6 with a video camera and instructions to tape any harassment or violence that occurred. Breece never had occasion to use the camera, although once while bantering with an employee Breece aimed the camera at him in jest. In October, 1993 NASSCO installed a permanent video camera, equipped with a microphone, atop Building

15. In response to union complaints, NASSCO removed the microphone but then attempted to reinstall it at two other locations. The first proved to be too high to record conversations at ground level; installation at the second was halted after the unions again complained. As a result, the microphone was never operational.

The unions filed unfair labor practice charges based upon each of the surveillance activities described above. After a hearing, an Administrative Law Judge issued findings and conclusions, holding that NASSCO violated § 8(a)(1) of the NLRA. The ALJ found that the videotaping at Gate 6 violated § 8(a)(1) because NASSCO had not "honestly believed that unprotected misconduct was currently going on or was imminent." The ALJ also found that Breece's presence at the guard shack with a video camera violated § 8(a)(1) because, although not as coercive as actual videotaping, "to carry the camera is to threaten its use," which has a tendency to coerce. Finally, the ALJ held that installation of the permanent camera atop Building 15 violated § 8(a)(1) because it had unprecedented audio and video recording capabilities.

The Board affirmed the ALJ's order with only two significant modifications. *See National Steel & Shipbuilding Co.*, 324 N.L.R.B. No. 85, 1997 WL 611805 (Sept. 30, 1997). First, the Board disagreed with the ALJ's factual finding that the video recording capability of the camera on top of Building 15 was unprecedented and accordingly eliminated that portion of the ALJ's order directing that the camera be dismantled. Second, the Board read its precedent as requiring that an employer, before videotaping protected labor activity, have a "reasonable, objective basis," not merely an honest, subjective belief, for anticipating misconduct.

The Board ordered NASSCO to cease using, or conveying the impression that it is using, video cameras or audio devices for the purpose of monitoring protected activities. The Board also required NASSCO to destroy the tapes of the Gate 6 rallies, to dismantle the audio capability of the Building 15 camera, and to post a notice to employees describing the Board's order.

## II. Analysis

■ In its petition for review, NASSCO challenges the sufficiency of the evidence supporting the Board's conclusion that it thrice violated the Act. The Board's findings of fact are conclusive if supported by substantial evidence and this court reviews the inferences drawn therefrom with considerable deference in light of the Board's expertise in these matters. *See Avecor, Inc. v. NLRB*, 931 F.2d 924, 928 (D.C.Cir.1991).

### A. Videotaping the Gate 6 Rallies

■ Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights" to engage in concerted collective activity guaranteed in § 7 of the NLRA. 29 U.S.C. § 158(a)(1). An employer violates § 8(a)(1) if its actions have merely a "tendency to coerce, [regardless of their] actual impact" in a particular case. *Avecor*, 931 F.2d at 932. The Board and the courts have long recognized that "absent proper justification, the photographing of employees engaged in protected concerted activities violates [§ 8(a)(1)] because it has a tendency to intimidate." *F.W. Woolworth Co.*, 310 N.L.R.B. 1197, 1197, 1993 WL 135443 (1993); *see also Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 681 F.2d 11, 19 (D.C.Cir.1982) (citing cases); *Waco, Inc.*, 273 N.L.R.B. 746, 747, 1984 WL 37122 (1984) (same). In *Woolworth* the Board concluded that photography and videotaping go beyond mere observation because "pictorial recordkeeping tends to create fear among employees of future reprisals." *F.W. Woolworth*, 310 N.L.R.B. at 1197.

■ The Board has also held that a reasonable, objective justification for video surveillance mitigates its tendency to coerce. For example, an employer's legitimate security interests may justify its use of surveillance cameras, even if they happen to capture protected activities. *See Lechmere, Inc.*, 295 N.L.R.B. 92, 94, 99–100, 1989 WL 224106 (1989), *rev'd on other grounds*, 502 U.S. 527, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992). Similarly, if an employer has a "reasonable basis for anticipating picket line misconduct," then its employees have less reason

to fear that the purpose of videotaping their protected activities is to aid in later taking reprisals against them. *See Waco*, 273 N.L.R.B. at 747. Gathering evidence for use in legal proceedings also constitutes a sufficient justification for videotaping protected activities. *See Roadway Express, Inc.*, 271 N.L.R.B. 1238, 1240, 1244, 1984 WL 36734 (1984); *see also NLRB v. Colonial Haven Nursing Home*, 542 F.2d 691, 701 (7th Cir. 1976) (holding that "anticipatory photographing . . . . does not violate § 8(a)(1) of the Act where the photographs are taken to establish for purposes of an injunction suit that pickets engaged in violence").

■ NASSCO claims that it had all of these justifications for videotaping the Gate 6 rallies. First, NASSCO argues that the tripod-mounted camera served a security function because "[a]ll too often, unlawful or unprotected conduct occurs instantaneously, with no warning, and is over within a matter of seconds." The short answer to this argument, for which the Board has substantial evidence, is that the Company already had security cameras monitoring the lot and guards with a full view of the Gate 6 area; the minimal additional security that videotaping may have provided, therefore, was outweighed by its tendency to coerce. *Cf. Parsippany Hotel Management Co. v. NLRB*, 99 F.3d 413, 420 (D.C.Cir.1996) (upholding Board's conclusion that employer increased security officers to seven from three in order to engage in surveillance of employees, not to increase security).

■ Second, the Company claims that it had a reasonable, objective expectation that misconduct was likely to occur. The Board concluded that NASSCO's support for this expectation was either too remote in time or was limited to violence that occurred during a strike, which the Board found a poor basis for anticipating violence during the unions' pursuit of the "inside game." Again, the Board's conclusion is supported by substantial evidence, highlighted by NASSCO's inability to cite a single instance of non-strike misconduct occurring between 1984 and the initiation of the videotaping involved in this case nine years later. Moreover, the Board

concluded that the videotaping continued long after NASSCO by its own action—namely, removing Breece from the guard shack after he reported that "nothing was going on"—"demonstrated that it did not believe that violence or other misconduct would occur." *National Steel*, 324 N.L.R.B. No. 85, at 3; *see UAW v. NLRB*, 455 F.2d 1357, 1368 (D.C.Cir.1971) (upholding Board's finding § 8(a)(1) violation when photographing union activity "continued long after it became apparent that there would be no violence on the picket line"); *see also Road Sprinkler*, 681 F.2d at 20 n. 8 (agreeing with Board's judgment that photographs "taken over three weeks after the only reported incident of picket line misconduct" had "inherent tendency" to coerce).

Finally, NASSCO attempts to justify videotaping the rallies at Gate 6 on the ground that it did in fact thereby gather evidence of misconduct. In this connection NASSCO claims that the ALJ relied upon its videotape of a morning rally at Gate 6 in concluding that the Company did not violate § 8(a)(1) when it videotaped union activity inside the plant that afternoon. NASSCO's characterization of the ALJ's decision is mistaken, however. The ALJ concluded that the afternoon activity was unprotected, and therefore that it was not an unfair labor practice for NASSCO to videotape it, based solely upon the contents of the afternoon videotape itself.

█ As an alternative to its arguments that the videotaping was lawful under the Board's precedents because it rested upon a reasonable objective justification, NASSCO claims that the evidence in this case compels the conclusion that the videotaping at Gate 6 did not in fact have a tendency to coerce employees. According to the Company, the Board's contrary conclusion therefore indicates that it impermissibly treated the videotaping as coercive per se. *Cf. United States Steel Corp. v. NLRB*, 682 F.2d 98, 101–03 (3d Cir.1982) (holding that § 8(a)(1) does not prohibit photography per se, only photography that has a reasonable tendency to coerce). Specifically, NASSCO argues that the Board should have determined that the videotaping at Gate 6 had no tendency to coerce employees because NASSCO had a

long history of videotaping protected union activity at Gate 6, NASSCO had never retaliated against an employee based upon protected activity it had videotaped, and the employees at the rallies appeared to be unfazed by the camera and indeed invited the local media to attend.

In our view the Board could reasonably conclude, notwithstanding this evidence, that NASSCO's video surveillance had a tendency to coerce employees. That about 100 union stalwarts were indifferent to the videotaping hardly compels the conclusion that the videotaping did not tend to coerce the other 2,900 employees. Nor, absent a reasonable objective justification for videotaping, need the Board find that the lack of past reprisals eliminates the tendency of videotaping to instill in employees a fear of future reprisals. We do not agree with the Company, therefore, that the Board has applied a per se rule against videotaping; rather the Board reasonably determined that NASSCO's proffered evidence was not of a type that necessarily ameliorates the coercive tendencies of videotaping.

In sum, the Board's conclusion that NASSCO violated § 8(a)(1) when it videotaped union rallies outside Gate 6 is consistent with approved Board precedent and supported by substantial evidence.

**B. The Other Section 8(a)(1) Violations**

█ NASSCO's challenges to the Board's conclusion that it violated § 8(a)(1) in two other respects may be resolved in short order. First, substantial evidence supports the Board's conclusion that adding audio capability to the Building 15 camera violated the Act. NASSCO's response that it "has historically used video cameras with audio recording capability during times of labor unrest" to record protected union activity near Gate 6 is, like its history of videotaping, insufficient to compel the conclusion that audio surveillance does not tend to coerce employees. NASSCO's claim that the camera, with its audio capability, was part of an on-going security upgrade, and therefore objectively justified under *Lechmere*, runs counter to substantial evidence in the record; in particular Hutchins, the Company's chief

of security, testified that the camera was not part of that upgrade, and cameras installed as part of that upgrade did not have audio capability. Finally, contrary to NASSCO's suggestion, that the microphone was never operational does not render this aspect of the Board's order moot; there is undisputed evidence that the camera still has audio capability. *See NLRB v. Mexia Textile Mills, Inc.,* 339 U.S. 563, 567–68, 70 S.Ct. 833, 94 L.Ed. 1067 (1950) ("A Board order imposes a continuing obligation; and the Board is entitled to have the resumption of the unfair practice barred by an enforcement decree.").

 Second, NASSCO failed in its opening brief to this court to contest the Board's finding that Breece's presence in the shack with a video camera violated § 8(a)(1). Consequently, that claim is waived and the Board is entitled to enforcement of the corresponding portion of its order. *See, e.g., Parsippany Hotel,* 99 F.3d at 418. NASSCO contends that until it received the Board's brief it did not know that Breece's conduct was the source of a separate violation of § 8(a)(1), *i.e.,* apart from the videotaping at Gate 6 and the installation of a camera with audio capability at Building 15, but that contention is belied by the face of the Board's decision and order. *See National Steel,* 324 N.L.R.B. No. 85, at 1 n. 2, 7.

### III. Conclusion

For the foregoing reasons NASSCO's petition for review is

*Denied.*