# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 24, 2007       Decided November 6, 2007

No. 06-1318

UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL
204 AND
UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL
UNION, AFL-CIO,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

SMITHFIELD PACKING COMPANY, INC. AND
SMITHFIELD FOODS, INC.,
INTERVENORS

———

On Petition for Review of an Order of the
National Labor Relations Board

———


*Renee L. Bowser* argued the cause and filed the briefs for petitioner.

*Elizabeth A. Heaney*, Attorney, National Labor Relations Board, argued the cause for respondent.  With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate

General Counsel, and *David S. Habenstreit*, Supervisory Attorney. *Fred B. Jacob*, Attorney, entered an appearance.

*Douglas M. Topolski* argued the cause for intervenors. With him on the brief were *Curtis L. Mack* and *Elena D. Marcuss*.

Before: SENTELLE, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL:

TATEL, *Circuit Judge*:  Following a union's unsuccessful effort to organize a plant, the National Labor Relations Board found that over the course of the union's campaign the employer committed several unfair labor practices in violation of the National Labor Relations Act.  Although the employer contests none of the Board's conclusions, the union challenges the Board's decision to dismiss two of its claims: (1) that statements by high-level company management constituted unlawful threats of plant closure; and (2) that the company's decision to train a security camera on union organizers created an illegal impression of surveillance.  Given the significant deference we owe the Board's factual findings, we deny the union's petition for review on both claims.  The union also challenges the adequacy of the Board's remedies, but because the union failed to present the issue to the Board, we lack jurisdiction over that claim.

## I.

This case arises out of the United Food and Commercial Workers' (UFCW) March 1999 attempt to organize a Smithfield Foods meatpacking plant in Wilson, North Carolina.  After a three-month campaign, the union lost the election.  The union filed a series of unfair labor practice charges against Smithfield, alleging that the company's antiunion campaign had tainted the

election. An administrative law judge found that Smithfield had committed several unfair labor practices in violation of sections 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3), (5). *See Smithfield Foods, Inc.*, 347 N.L.R.B. No. 109, at 38 (Aug. 31, 2006) (finding that Smithfield unlawfully discharged employees, engaged in interrogation, and threatened job, pay, and benefit losses as a result of employee union activities, among other violations). Relevant to this appeal, the ALJ determined that Smithfield executives violated section 8(a)(1) by threatening to close the company's Wilson plant if workers unionized and by training the facility's security camera on union organizers as they distributed handbills near the plant's entrance. Finding a widespread pattern of "repeated and pervasive unfair labor practices of a hallmark nature," *Smithfield*, 347 N.L.R.B. No. 109, at 37, the ALJ recommended that the Board order Smithfield to bargain with the UFCW pursuant to *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 610 (1969) (upholding the Board's authority to issue a bargaining order when an employer's unfair labor practices "have made the holding of a fair election unlikely" or "have in fact undermined a union's majority and caused an election to be set aside").

On review, although the Board upheld most of the ALJ's findings, it found for Smithfield on the issues of threatened plant closure and video surveillance. The Board also declined to issue a bargaining order, instead mandating a new election along with several "extraordinary remedies" to ensure the fairness of the second election. *Smithfield*, 347 N.L.R.B. No. 109, at 8. The union now seeks review of the Board's dismissal of the unfair labor practice charges and challenges the Board's remedies as inadequate.

We will uphold the Board's dismissal of an unfair labor practice charge "unless its findings are unsupported by substantial evidence in the record considered as a whole, or

unless the Board 'acted arbitrarily or otherwise erred in applying established law to facts.'" *Gen. Elec. Co. v. NLRB*, 117 F.3d 627, 630 (D.C. Cir. 1997) (quoting *Allegheny Ludlum Corp. v. NLRB*, 104 F.3d 1354, 1358 (D.C. Cir. 1997)). Under this deferential standard of review, we will reverse the Board's factual determinations "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Resort Nursing Home v. NLRB*, 389 F.3d 1262, 1270 (D.C. Cir. 2004). We will not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). With this limited role in mind, we consider each of the union's challenges.

## II.

NLRA section 7 guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The NLRA safeguards these rights through section 8(a)(1), which makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7]." *Id.* § 158(a)(1). Section 8(c), however, protects employers' First Amendment rights to convey their views on unionization to employees so long as such expression "contains no threat of reprisal or force or promise of benefit." *Id.* § 158(c).

The Supreme Court addressed the relationship between sections 8(a)(1) and 8(c) at length in *Gissel*, explainin*g*:

> [A]n employer is free to communicate to his employees any of his general views about

unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

395 U.S. at 618 (citations omitted). We have often applied *Gissel* in situations involving allegedly unlawful employer speech. In *Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130 (D.C. Cir. 1994), we found an employer's letter attacking a union's record on job security protected under NLRA section 8(c), noting that "[i]f the Board may take management statements that very emphatically assert a risk, twist them into claims of absolute certainty, and then condemn them on the ground that as certainties they are unsupported, the [employer's] free speech right is pure illusion." *Id.* at 1140. Similarly, in *General Electric*, we dismissed an unfair labor practice charge because the employer "did not 'warn' employees that [the company] would retaliate if the union won the election," but rather "conveyed to employees the risks of voting in the union."

117 F.3d at 633. In *Allegheny Ludlum*, however, we upheld an unfair labor practice violation where the employer warned it would "no longer find ways" to avoid laying off employees if they joined a union. 104 F.3d at 1367.

Taken together, in a case like this, which deals only with predictions of adverse economic consequences, *Crown Cork & Seal*, *General Electric*, and *Allegheny Ludlum* establish a two-part inquiry to distinguish "permissible predictions" from "forbidden threats." *Crown Cork & Seal*, 36 F.3d at 1135. First, did the employer predict "adverse economic consequences" as a result of unionization? *Id.* at 1134. If not, the inquiry ends. But if the employer made such predictions, then we proceed to the second question: did those predictions rest on objective facts outside the employer's control?

Guided by these questions, we turn to the union's claim that communications by high-level Smithfield managers during the unionization campaign constituted unlawful threats of plant closure. In a series of speeches and letters designed to combat the UFCW's unionization campaign, Plant Manager Phil Price and Smithfield President and Chief Operating Officer Lewis Little repeatedly told employees that three other companies had previously operated the Wilson plant, that the UFCW had unionized the plant under each of those companies, and that each company ultimately shut down the plant. Both managers, however, carefully avoided linking the previous closures directly to the union. For example, in one speech Price mentioned the three previous plant closures but made clear he had no idea whether the UFCW had caused them:

> In none of these three cases did a union contract provide long-term job security for employees. Maybe it was just the opposite. Maybe the union forced inflexible rules on these companies so

> that they could not compete in today's
> environment. Maybe this union made it so these
> companies couldn't satisfy their customers'
> demands. It really doesn't matter. Whether this
> union caused these other three plants to close is
> not for me to say. I don't know what happened.
> I do know that Smithfield wants this plant to be
> a success . . . .

Later in the unionization campaign, Price sent a letter to all Smithfield employees that again emphasized the Wilson plant's repeated failures under previous management. Offering no prediction about the company's intentions, he stated, "I can't predict the future, especially if the union were to get in," and he again disclaimed any direct link between the union and the previous plant closures. Price wrote:

> Did the UFCW *cause* these three companies to
> close the plant here on Wilco Boulevard? I don't
> know the answer to that. Maybe they did, maybe
> not. But I can spot a bad trend. . . . The UFCW
> is obviously a jinx for this plant. They have
> struck out for Wilson employees three times.
> It's time for another approach.

Finally, in an election-eve speech to employees, Smithfield President Lewis Little explained that he was "committed to the success of this plant." Echoing Price's letter, however, Little made no predictions: "I cannot stand here and tell you what will happen." He concluded by urging employees not to "hang the UFCW around this plant's neck for a fourth time."

Although this appeal concerns statements by Price and Little, the two were not the only company representatives encouraging Smithfield employees to reject the union. During

the unionization campaign, lower-level Smithfield supervisors held smaller meetings with various plant workers. Less circumspect than Price and Little, they expressly warned that the company could close the Wilson plant if employees chose to unionize. The ALJ found these unambigious statements violated the NLRA. *See Smithfield*, 347 N.L.R.B. No. 109, at 18. Rounding out Smithfield's antiunion effort, another high-level executive, Human Resources Director Sherman Gilliard, appeared in a video shown to employees prior to the election. In contrast to Price and Little, Gilliard linked one of the previous plant closures directly to the union, opining, "If anything, [the UFCW] pretty much ran the company out of business." Due to the General Counsel's procedural error, the ALJ declined to rely on Gilliard's statements to make specific findings of unlawful conduct, but he did consider the statements relevant to place Price's and Little's statements in context. *Smithfield*, 347 N.L.R.B. No. 109, at 17 n.19. Based on the "full circumstances," the ALJ ruled that Price and Little unlawfully threatened employees by repeatedly mentioning the three previous plant closures without providing a sufficient objective explanation for the closures. *Id.* at 17.

The Board disagreed. Reviewing all the evidence "in context," the Board, over one member's dissent, found no threat or coercion in Price's and Little's statements and concluded that they merely contained "relevant, factual information about the union's history at the facility." *Id.* at 2. The Board emphasized that the two managers "never mentioned closure" and "expressly disclaimed any certainty about the connection between the previous closures at the Wilson facility and the union." *Id.* at 3. Turning to the lower-level supervisors, the Board upheld the ALJ's conclusion that their statements violated NLRA section 8(a)(1) because these more explicit threats "offer a clear contrast with the speech by Plant Manager Price." *Id.*

The union argues that under *Gissel* an employer can violate the Act by merely suggesting that it *may* close a plant as a result of unionization; it need not definitively assert that it *will* do so. Placing the statements recounted above in the context of the company's overall antiunion campaign, the union contends that the unmistakable effect of Price's and Little's remarks was to threaten workers with the specter of a plant shutdown. That being the case, the union argues, the managers violated the Act by failing to provide any objective justification for the previous plant closures. Instead, "Smithfield's top managers expressly blamed the past closures at Wilson on the union," Pet'r's Opening Br. 6, leaving employees to believe that if they chose UFCW representation, they would suffer the same fate as the plant's previous occupants.

The Board reads the record differently. It argues that neither Price nor Little ever raised the possibility that Smithfield might shut the plant. As the Board sees it, Price and Little simply related indisputable historical facts without ever explicitly linking previous plant closures to the UFCW. Under this interpretation of the record, case law requiring an employer to provide objective justification for a predicted plant closure—the second of the two questions established in our case law—has no applicability to this appeal because here the managers never made such a prediction.

Thus, this case turns on the reasonableness of the Board's characterization of the evidence. Did Price and Little threaten employees by predicting plant closure (as the union argues), or did they simply relate the unfortunate history of the Wilson plant to combat the union's message that it could provide job security for workers (as the Board found)? Did the managers blame the previous shutdowns on the union, leading employees to understand that a vote for the union was a vote for plant closure (as the union argues), or did they assiduously avoid drawing any

link between unionization and closure, leaving employees to come to their own independent conclusions (as the Board found)? As noted above, our standard of review for resolving such questions is highly deferential. Indeed, we "must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *Gissel*, 395 U.S. at 620. And we grant "the Board even greater deference with respect to questions of fact that turn upon motive." *Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1004 (D.C. Cir. 1998).

Applying this deferential standard of review to the facts before us, we conclude that substantial evidence supports the Board's finding that neither Price nor Little threatened to close the Wilson plant in the event of unionization. As the Board found, neither executive predicted that the company would take any particular course of action, nor did either ever suggest closing the plant. To the extent that Little made any prediction at all, he told employees that he intended to invest in the Wilson facility and was "committed" to its success. The record also reveals that when asked whether Price ever said that "the plant would close if the union got in," one employee responded, "No, he just asked what would—what do we think would happen." Finally, in a pre-election speech to employees, Little mentioned that Smithfield had dealt with the UFCW at other plants, and told employees that in the event of a strike Smithfield would "operate the plant without" the striking workers. We are also satisfied that the Board took the Gilliard video and the lower-level supervisors' statements into account when examining the overall context in which Price and Little made their remarks. *See Smithfield*, 347 N.L.R.B. No. 109, at 3 n.13 ("[T]he videos, letters and speeches . . . in context, recount the failure of the three previous plant owners, whose employees were represented by the union, to remain competitive and in business.").

In upholding the Board's decision, we acknowledge that the record could be read differently. Perhaps the Board could have interpreted the managers' statements as the union does, namely as "thinly veiled prediction[s] that electing the union a fourth time would result in closure." Pet'r's Opening Br. xv. Nevertheless, as the union acknowledges, it is the Board's duty, not ours, to "focus on the question: 'What did the speaker intend and the listener understand?'" *Id.* at 5 (quoting *Gissel*, 395 U.S. at 619). Here, the Board determined that threats were neither intended nor understood. Had the Board reached the opposite conclusion, we likely would have deferred to that determination as well. For, as we have previously noted, "the very existence of competing views reinforces the need for reliance on the Board's experience." *Hoffman Plastic Compounds, Inc. v. NLRB*, 237 F.3d 639, 647 (D.C. Cir. 2001), *rev'd on other grounds*, 535 U.S. 137 (2002).

The union argues that the Board departed from its own precedent, specifically *Eldorado Tool, Division of Quamco, Inc.*, 325 N.L.R.B. 222 (1997). There, the employer had displayed a poster depicting a row of tombstones bearing names of plants that had previously closed after unionization. The last tombstone bore the employing plant's own name with a question mark beneath it. *Id.* at 222. Although the Board concluded that the employer's actions violated the Act, the case is both distinguishable and irrelevant. It's distinguishable because there the Board found that "no member of the [employer's] management ever sought to clarify the message, or to assure employees that it was not predicting that the same fate awaited [them] as had befallen other plants," *id.* at 223, while here the Board found exactly the opposite. And it's irrelevant because it has nothing to do with the question before us—whether the record supports the Board's decision. Viewed in this light, *Quamco* represents nothing more than an example of the Board properly exercising its judgment to interpret arguably

ambiguous statements made in the employment context.

## III.

While Smithfield executives delivered antiunion messages inside the plant, union representatives gathered outside the facility's front gate to encourage entering employees to join the UFCW. When union organizers began their campaign, Smithfield painted a red line on the plant's driveway to distinguish public property from company property. From late March 1999 until the election on July 8, union representatives congregated at the driveway and distributed handbills to employees as they went to work. Early in the organizing effort, Smithfield's security guard, Joe Pittman, saw union representatives cross the red line onto company property "seven to ten times" over the course of one day. Approaching the organizers, Pittman asked them to stay behind the line and then escorted them back to public property. When the union representatives immediately followed him back onto company property, Pittman warned he would call the police unless they stayed on their side of the line. When they ignored him, Pittman carried out his threat. The police arrived and informed the organizers that they had to remain on public property or risk arrest. The warning apparently had some effect, as later in the campaign, one union representative told a Smithfield employee that he could not cross the red line "[b]ecause he would be trespassing [] and he'd get locked up."

Pittman testified that following this trespassing incident, he reoriented a security camera—which normally monitored the plant's parking lot and front gate—to focus farther down the driveway on the union organizers "in case [the company] needed some type of documentation that they were in fact on [company] property." The images from the camera appeared on television monitors inside a guard shack near the plant entrance, which was manned by one or two guards. Employees on their way to

work could see the screens as they walked through the guard shack, but neither they nor the guards could make out facial features or identify individuals from the images. The camera usually recorded onto a videotape, and the guards typically rewound the tape at the end of each shift to record over the images the following day. Pittman acknowledged, however, that guards occasionally neglected to insert a tape into the recording device, explaining, "I mean the person on the shift before me may have not put [a tape] in when it ran out or whatever." Smithfield left the camera trained on the union organizers until the July 8 election, more than three months after the initial trespassing incident. After the unionization campaign ended, the company returned the camera to focus on its original target.

Under Board precedent, employers may not photograph or videotape employees engaged in concerted collective activities without legitimate justification. *See Nat'l Steel & Shipbuilding Co. v. NLRB*, 156 F.3d 1268, 1271-72 (D.C. Cir. 1998) (upholding the Board's finding that a company committed an unfair labor practice by videotaping union rallies without sufficient justification). Preventing trespass may qualify as a legitimate justification for videotaping. *See Beverly Health & Rehab. Servs., Inc. v. NLRB*, 317 F.3d 316, 325 (D.C. Cir. 2003). "Gathering evidence for use in legal proceedings also constitutes a sufficient justification for videotaping protected activities." *Nat'l Steel & Shipbuilding*, 156 F.3d at 1271. In short, to assess the legality of an employer's surveillance activity, the Board asks "whether there was proper justification and whether it reasonably tends to coerce employees." *Timken Co.*, 331 N.L.R.B. 745, 754 (2000).

In this case, the ALJ found that Smithfield's videotaping created the impression of surveillance in violation of the NLRA. The Board disagreed, ruling that Smithfield's reasonable concern over continued union trespassing justified the

company's decision to reposition the camera. The dissenting Board member found a single trespassing incident insufficient to justify continuous video monitoring over the course of a three-month unionization campaign. The majority dismissed that objection because the union "never offered assurances that it would not trespass again." *Smithfield*, 347 N.L.R.B. No. 109, at 4 n.15. Once again, we ask whether the Board's determination finds support in the record—specifically, whether substantial evidence supports the Board's conclusion that Smithfield's fear of trespass justified its surveillance activities. And once again, our review of that question is highly deferential: "The Board's findings of fact are conclusive if supported by substantial evidence and this Court reviews the inferences drawn therefrom with considerable deference in light of the Board's expertise in these matters." *Nat'l Steel & Shipbuilding*, 156 F.3d at 1271.

The union argues that the Board should have discredited Smithfield's trespassing rationale because the company taped over the recorded images each day and sometimes even failed to insert videotapes into the camera's recording device. According to the union, these facts belie Smithfield's purported concern over trespass and reveal that its true purpose in repositioning the camera was to chill employees' exercise of their rights under NLRA section 7. We are unpersuaded. It would make little sense for the company to maintain an inventory of tapes showing no evidence of trespass, and according to Pittman's testimony, the company's occasional failure to insert a videotape into the recording device seems to have resulted from ordinary human error.

Considering the record as a whole, and according due respect to "the Board's expertise in these matters," *Nat'l Steel & Shipbuilding*, 156 F.3d at 1271, we conclude that substantial evidence supports the Board's finding that Smithfield acted to

protect its property rather than to intimidate its employees. To begin with, union organizers trespassed onto company property and "openly mocked" Pittman when he tried to escort them back across the red line. Resp't's Br. 23. Second, after the trespassing incident, union organizers continued distributing handbills at the very boundary line separating company property from public land. Finally, giving added support to the Board's finding that the company sought merely to protect its property, not to coerce or intimidate its employees, Smithfield reoriented its camera only after the union trespassed, and the ALJ found that "[d]etails such as facial identification could not have been determined by looking at the camera monitors," *Smithfield*, 347 N.L.R.B. No. 109, at 13. Not only does the Board's decision thus find ample support in the record, but it is on all fours with *Washington Fruit & Produce Co.*, 343 N.L.R.B. 1215 (2004). There, the Board found no violation when an employer, "concerned about a recurrence of trespassing on the property," authorized video surveillance of a planned union rally "to gather and preserve evidence." *Id.* at 1217. "Given prior incidents of trespassing on the [employer]'s property, which had led [the employer] to contact the police, it was," the Board concluded, "prudent of [the employer] to plan on documenting the union's rally." *Id.* at 1218. By applying this reasoning to Smithfield's conduct, the Board acted neither arbitrarily nor capriciously.

Next, the union asserts that even if Smithfield had a reasonable justification for videotaping union organizers, the Board's decision in *Randell Warehouse of Arizona, Inc.*, 347 N.L.R.B. No. 56 (July 26, 2006), required Smithfield to communicate that justification to employees "in a timely manner," which the company failed to do. *Id.* at 8. According to the Board, the union ignores a key exception in *Randell Warehouse*, which states that an employer has no obligation to communicate its justification for video surveillance to employees "in cases where the justification is self-evident (e.g.,

violence or mass picketing, etc.).” *Id.* Citing the union organizers' close proximity to company property, the need for the red boundary line, the previous trespassing incident, and the fact that one union representative explained the company's concern with trespass to an inquiring employee, the Board insists that Smithfield's justification for videotaping falls within *Randell Warehouse*'s exception as "self-evident." We find this persuasive, and the union points to nothing in the record leading us to question the Board's view.

## IV.

The union's final challenge concerns the scope of the remedies the Board imposed to redress Smithfield's NLRA violations. Finding a widespread pattern of "repeated and pervasive unfair labor practices of a hallmark nature," the ALJ recommended imposing a bargaining order. *Smithfield*, 347 N.L.R.B. No. 109, at 37. After the ALJ inadvertently failed to include this remedy in his order, the union filed an exception to the Board requesting its inclusion. The Board, concerned that its own "long and unjustified delay in processing the case" could render a bargaining order unenforceable, declined to decide the issue and instead ordered a new election. *Id.* at 8. Noting the company's "proclivity to violate the Act," however, the Board ordered several "extraordinary remedies" to ensure the fairness of the new election, including a broad cease and desist order and a requirement that Smithfield mail notice to all employees, post and mail a notice in Spanish, and give the union the names and addresses of all current employees. *Id.* at 8-9. Although the union failed to file a motion for reconsideration challenging this order, it now urges us to review and overturn the Board's remedies as inadequate and inconsistent with prior Board precedent.

NLRA section 10(e) bars this Court from considering any "objection that has not been urged before the Board . . . unless

the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). The Supreme Court has made clear that a petitioner must seek Board reconsideration or rehearing before it brings an issue to the courts, even when the Board has discussed and decided the contested issue. *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982). Because the union failed to file a motion for reconsideration challenging the Board's remedies, section 10(e) precludes us from reviewing the union's claim.

Attempting to evade section 10(e)'s clear jurisdictional bar, the union argues that it "preserved the issue of the bargaining order remedy because it provided the Board adequate notice of the union's objection to the failure to order the bargaining order in its exceptions to the Board." Pet'r's Reply Br. 1. The union misunderstands section 10(e). The union never raised before the Board the objection it now asserts—the inadequacy of the Board's alternative extraordinary remedies—so it makes no difference that the union once urged the Board to issue a bargaining order. Because the union gave the Board no opportunity to rule on the particular issue it presents here, section 10(e) bars us from considering it.

## V.

For the reasons given above, we deny the union's petition for review.

*So ordered.*