# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 20, 2020      Decided September 17, 2021

No. 19-1150

CADILLAC OF NAPERVILLE, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 19-1167

———

On Petition for Review and Cross-Application for
Enforcement of an Order of the
National Labor Relations Board

———

*Michael P. MacHarg* argued the cause for petitioner. With him on the briefs was *Tae Y. Kim*. *Alisa P. Cleek* entered an appearance.

*Jared D. Cantor*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Ruth E. Burdick*, Acting Deputy Associate General Counsel, *David S. Habenstreit*, Assistant General Counsel, and *Julie B. Broido*, Supervisory Attorney.

Before: MILLETT, PILLARD, and KATSAS, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* KATSAS.

PER CURIAM: The service mechanics at Cadillac of Naperville went on strike in August 2017. The National Labor Relations Board found that the dealership responded to the strike unlawfully by discharging one mechanic for his union activity, threatening to retaliate against several mechanics, and refusing to bargain with the mechanics' union. The dealership challenges these rulings, as well as two procedural rulings by the administrative law judge.

At the NLRB's request, we remand the discharge issue for the Board to apply its intervening decision changing the framework under which it assesses alleged retaliation in mixed-motive cases. We reject the dealership's other challenges.

I

A

Section 7 of the National Labor Relations Act gives employees the right to unionize, to bargain collectively, and to engage in concerted action for their "mutual aid or protection." 29 U.S.C. § 157. Section 8(a) of the Act safeguards those rights by prohibiting employers from engaging in a variety of unfair labor practices. Section 8(a)(1) makes it unlawful to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by section 7. *Id.* § 158(a)(1). Section 8(a)(3) prohibits employment discrimination to "discourage membership" in a union. *Id.* § 158(a)(3). Section 8(a)(5)

makes it unlawful "to refuse to bargain collectively" with a union. *Id.* § 158(a)(5).

B

Cadillac of Naperville, Inc. (Naperville) is an auto dealership in Naperville, Illinois. The dealership is a member of the New Car Deal Committee (NCDC), a multiemployer bargaining unit including employees in 129 dealerships in the Chicago area. The NCDC negotiates master collective-bargaining agreements with the Automobile Mechanics Local 701, International Association of Machinists and Aerospace Workers, AFL-CIO, which represents some 2,000 mechanics employed across the dealerships.

In May 2017, the NCDC and the union began to negotiate a new collective-bargaining agreement. The union negotiators included Naperville mechanic John Bisbikis as well as union representatives Sam Cicinelli and Kenneth Thomas.

On June 29, Bisbikis approached Frank Laskaris, the owner and president of Naperville, to discuss shop-related issues. In particular, Bisbikis asked Laskaris to rescind the dealership's new policy of charging workers for part of the cost of their uniforms. Laskaris rebuffed the request and turned the conversation to the "sputtering labor negotiations." *Cadillac of Naperville, Inc.*, 368 N.L.R.B. No. 3, slip op. at 8 (June 12, 2019). Laskaris then "warned" Bisbikis that "things would not be the same" if the mechanics decided to strike. *Id.* at 17; *see also id.* at 3, 8, 19–20. On August 1, after the collective-bargaining agreement expired, mechanics at the NCDC dealerships went on strike.

On August 9, Naperville informed six of its strikers, including Bisbikis, that they had been permanently replaced. The notices stated that the strikers would be placed on a

preferential hiring list, but only if they unconditionally applied to return to work. In response, the strikers escalated their demonstrations. Positioning themselves directly across the main entrance to the dealership, they blew horns, sought to engage customers, and yelled at non-striking employees. On one occasion, a striker named Patrick Towe impeded an elderly customer's test drive by walking in front of her vehicle.

On September 15, the NCDC and the union entered into a settlement that allowed many of the strikers to return to work. Two days later, the union's members ratified both the settlement and a successor collective-bargaining agreement.

On September 18, Bisbikis, Cicinelli, and Thomas met with Laskaris to discuss the strikers' recall. Laskaris stated that he did not want Bisbikis present because Bisbikis was a ringleader of the strike and Laskaris no longer wanted to employ him. On Cicinelli's advice, Bisbikis left the room. Later that day, Bisbikis, Cicinelli, and Thomas met again with Laskaris. In that meeting, Bisbikis called Laskaris a liar, Laskaris responded that Bisbikis should "get the f*** out" of the room, and Bisbikis replied by calling Laskaris a "stupid jack off" in Greek. *Naperville*, 368 N.L.R.B. No. 3, at 10. As Bisbikis left the room, Laskaris said, "[E]ven if I have to take you back, now I'm firing you for insubordination." *Id.* Laskaris did fire Bisbikis, assertedly for insubordination.

On September 20, Laskaris spoke with Towe, the mechanic who had obstructed the test-drive. Laskaris said he hoped that employees would refrain from such conduct. He then said, "I don't want any of you here," and told Towe to look for another job because Towe would not be employed at Naperville for long. *Naperville*, 368 N.L.R.B. No. 3, at 12.

On September 21, Laskaris sought to restrict union access to Naperville premises. In a letter to the union, he stated that

Cicinelli and Thomas were no longer welcome on the property because of their assertedly threatening conduct. And he required other union representatives to make appointments to see union members while they were at work.

On September 25, Laskaris held a staff meeting to complain about union leafletting outside the dealership even after the strike was over. He told employees that the leafleting was "taking money out of their pockets" and that if the dealership ran out of work, "all of the recalled employees would be laid off." *Naperville*, 368 N.L.R.B. No. 3, at 13.

On October 6, Laskaris held another staff meeting. For forty minutes, he expounded on the strike and its aftermath. At one point, Laskaris threatened to enforce company rules more strictly: "I suggest you read your little blue book that he waved in my face like a smug a\*\*hole … and if I follow that book your life will get harder …. There's so much stuff in that book that nobody enforces. Why? Because we don't want to be that kind of place." *Naperville*, 368 N.L.R.B. No. 3, at 15 (ellipses in original). At another point, Laskaris disparaged the grievance process in the collective-bargaining agreement: "Let me tell you about the grievance process…. What I'm telling you is I don't give a s\*\*\* about grievances. Grieve all you want. It doesn't matter. They can't do s\*\*\*…. I don't care on what you grieve, I don't care how much you complain, they're not going to tell me what to do." *Id.* Laskaris's summation was even more colorful:

> I can be the nicest guy in the world, you put me in a corner, I'm going to f\*\*\*ing eat your face. That's who I am. I'll give you a kidney, Ronnie[,] but you f\*\*\* with me and my people, I'm going to eat your kidney out of your body and spit it at you. That's how nasty I can be. It's not in my nature to be a prick, but

> when I see s\*\*\* like that Pat, it's easy to be a prick to you; real easy. And they can't stop me from being a prick.

*Id.* at 16. One mechanic secretly made a recording of the tirade, which the NLRB later admitted into evidence.

On October 27, Laskaris spoke with Brian Higgins, a mechanic who had been permanently replaced during the strike. When Higgins expressed an interest in returning to work, Laskaris said that he did not want Higgins or any of the permanently replaced employees at the dealership and that if Higgins did return, "it would not be long before he was gone." *Naperville*, 368 N.L.R.B. No. 3, at 16.

## C

The union filed a complaint against Naperville. After a hearing, an administrative law judge found that Naperville had committed several unfair labor practices. First, the ALJ found that Laskaris violated section 8(a)(1) of the NLRA by making threats to employees. The threats included telling Bisbikis that "things would not be the same" if the mechanics went on strike, advising Towe to look for another job, announcing that recalled employees would be laid off if work ran out, warning of stricter enforcement of company rules, describing grievances as futile, saying that he would eat an employee's kidney, and implying that Higgins would quickly be fired if he returned to work. *Naperville*, 368 N.L.R.B. No. 3, at 16–19. Second, the ALJ found that Naperville violated sections 8(a)(1) and 8(a)(3) by firing Bisbikis in retaliation for his union activity. *Id.* at 19–21. Finally, the ALJ found that Naperville violated sections 8(a)(1) and 8(a)(5) by restricting the union's access to its members. *Id.* at 22.

The NLRB affirmed these findings but gave different reasoning as to the firing of Bisbikis.  The ALJ had assessed the firing under *Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980).  Under that decision, the agency bears the initial burden of proving that union activity was a "motivating factor" in an adverse action against an employee; if the agency meets this burden, the employer must prove that it "would have taken the same action in the absence of the unlawful motive."  *Novato Healthcare Ctr. v. NLRB*, 916 F.3d 1095, 1101 (D.C. Cir. 2019).  In contrast, the Board assessed the discharge under *Atlantic Steel Co.*, 245 N.L.R.B. 814 (1979).  That decision identifies four factors for determining whether an employee has forfeited NLRA protection through "opprobrious conduct": "(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice."  *Id.* at 816.

 Naperville sought review of the Board's decision, and the Board filed a cross-application for enforcement.  After briefing had concluded, the Board asked us to remand the discharge issue for reconsideration in light of its intervening decision in *General Motors, LLC*, 369 N.L.R.B. No. 127 (July 21, 2020).  That decision held that *Wright Line*, not *Atlantic Steel*, provides the appropriate framework for analyzing adverse actions that might reflect either protected activity or misconduct by the employee.  *Id.*, slip op. at 1–2.

We have jurisdiction over the petition for review under 29 U.S.C. § 160(f) and over the cross-application for enforcement under 29 U.S.C. § 160(e).

II

Naperville first challenges two evidentiary rulings made by the ALJ.  We review such rulings only for abuse of

discretion, and we require prejudice to set them aside. *See Napleton 1050, Inc. v. NLRB*, 976 F.3d 30, 39 (D.C. Cir. 2020).

A

Naperville contends that the ALJ did not give it adequate access to witness affidavits at the administrative hearing. The Board's regulations permit respondents to use and examine witness affidavits "for the purpose of cross-examination." 29 C.F.R. § 102.118(e)(1). Naperville asked to retain a witness's affidavit for a short time after his cross-examination, but the ALJ required it to return the affidavit immediately.

Right or wrong, the ALJ's decision was not prejudicial. Whether an error is prejudicial depends on the "closeness of the case, the centrality of the issue in question, and the effectiveness of any steps taken to mitigate the effects of the error." *800 River Rd. Operating Co., LLC v. NLRB*, 846 F.3d 378, 386 (D.C. Cir. 2017) (quoting *Huthnance v. District of Columbia*, 722 F.3d 371, 381 (D.C. Cir. 2013)). Here, although Naperville bore the burden of showing prejudice, *see Desert Hosp. v. NLRB*, 91 F.3d 187, 190 (D.C. Cir. 1996), it made no attempt to do so. Its briefs did not explain how retaining the affidavit after the cross-examination might have improved its prospects at the hearing. And when asked about prejudice at oral argument, Naperville argued only that showing it was unnecessary. We thus reject Naperville's challenge to the ruling on the witness affidavit.

B

Naperville challenges the Board's admission of the recording of the October 6 meeting. Naperville contends that the recording was made in violation of Illinois law, which prohibits recording a "private conversation" without the consent of all parties, 720 Ill. Comp. Stat. 5/14-2(a)(2).

The NLRA provides that Board proceedings "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States." 29 U.S.C. § 160(b). Thus, the NLRB must follow the Federal Rules of Evidence unless doing so would be impracticable. *See McDonald Partners, Inc. v. NLRB*, 331 F.3d 1002, 1007 (D.C. Cir. 2003). Under Rule 402, "[r]elevant evidence is admissible" unless the United States Constitution, a federal statute, the Rules themselves, or "other rules prescribed by the Supreme Court" provide otherwise. Fed. R. Evid. 402. The recording—which contains several statements by Laskaris alleged to be threatening or coercive—is plainly relevant to the unfair-labor-practice claims at issue. Naperville neither disputes the relevance of the recording nor contends that any other Federal Rule requires its exclusion. Nor does Naperville contend that following Rule 402 was impracticable. The ALJ thus properly admitted the recording.

Naperville's objections are unpersuasive. First, the dealership argues that admitting the tape frustrated Illinois' public policy of discouraging secret recordings. But as explained above, the NLRA makes clear that state policy does not dictate the admissibility of evidence in Board proceedings. Next, Naperville objects that admitting the recording contravened *Weiss v. United States*, 308 U.S. 321 (1939), which requires the suppression of items intercepted in violation of the Communication Act of 1934. *Id.* at 331. But that federal statute expressly made such communications inadmissible in court. *Id.* at 326; *see also Nardone v. United States*, 302 U.S. 379, 380–82 (1937). Naperville does not contend that any similar federal statute or rule applies here. Finally, Naperville argues that admitting unlawful recordings will prejudice employers. But it provides no reason to think that employees are more likely to record their employers than *vice versa*. And in any event, the governing rules provide no textual basis for

accommodating Naperville's naked policy argument. The ALJ permissibly admitted the recording.[1]

## III

We turn to the substance of the Board's decision. Our review is "deferential," *Comau, Inc. v. NLRB*, 671 F.3d 1232, 1236 (D.C. Cir. 2012) (cleaned up), but not a "rubber stamp," *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 484 (D.C. Cir. 2020). Although we "accord considerable deference" to the Board's policy judgments, *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1250 (D.C. Cir. 2012), we must set aside a decision that rests on an error of law, is unsupported by substantial evidence, or "departs from established precedent without a reasoned explanation," *Comau*, 671 F.3d at 1236 (cleaned up).

## A

Section 8(a)(1) of the NLRA makes it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of" their right to bargain collectively. 29 U.S.C. § 158(a)(1). This section "forbids coercive statements that threaten retaliation against employees" for protected union activity. *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001). Section 8(c), however, cabins section 8(a)(1). It provides that expressing "any views, argument, or opinion" is neither an unfair labor practice nor evidence of an unfair labor practice, as long as the views contain "no threat of reprisal or

---

[1] Because we resolve this issue under the Federal Rules of Evidence, we need not address the Board's alternative argument that the recording was not of a "private conversation" covered by the Illinois law. *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1266 (D.C. Cir. 1995).

force or promise of benefit." 29 U.S.C. § 158(c). We assess whether statements violate section 8(a)(1) under "the totality of the circumstances," with an eye to whether "the statement has a reasonable tendency to coerce or to interfere with" section 7 rights. *Tasty Baking*, 254 F.3d at 124.

We begin with the several statements on which the panel is unanimous, then we address the one statement on which we are divided.

1

We unanimously conclude that the challenged statements made by Laskaris in September and October of 2017 threatened retaliation for protected activity and thus constituted unfair labor practices.

a

The Board found that Laskaris violated section 8(a)(1) on September 20, by telling Towe that he did not want any former strikers at the dealership and that Towe should look for a new job. The Board reasoned that the statement threatened to discharge Towe for his union activity. *Naperville*, 368 N.L.R.B. No. 3, at 1 n.2. We agree.

Naperville argues that Laskaris threatened to fire Towe not because of his union activity but because of his misconduct during the strike, which included obstructing a test-drive. This argument overlooks Laskaris's comment regarding the other strikers. Moreover, the ALJ found that the "overarching theme" of Laskaris's criticism was Towe's union activity, not the one specific instance of misconduct. *Naperville*, 368 N.L.R.B. No. 3, at 17. And that finding, in turn, rested on the ALJ's decision to credit Towe's testimony about the conversation, *id.* at 12 n.24, which we accept because it was

not "patently insupportable," *Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243, 1246 (D.C. Cir. 1994) (quoting *NLRB v. Creative Food*, 852 F.2d 1295, 1297 (D.C. Cir. 1988)).

b

The Board found that Laskaris violated section 8(a)(1) on September 25, by telling the recalled mechanics that union leafletting was harming the dealership financially and that he would fire them if the dealership ran out of work. The Board reasoned that Laskaris targeted only former strikers, as opposed to the dealership's employees in general, thereby singling them out for a threat of adverse treatment based on protected activity. *Naperville*, 368 N.L.R.B. No. 3, at 3.

Naperville's responses do not persuade. First, it argues that section 8(c) protected its criticism of the leafletting. But the Board found an unfair labor practice based on a threat to fire the recalled mechanics, not because Laskaris criticized the leafletting. Naperville also would construe the comments as a truism governing all employees generally—no work means no jobs. But Laskaris made the comments in a staff meeting involving only the former strikers, and the Board reasonably construed the comments as directed against them specifically.

c

As to the October 6 philippic, the Board found that three statements crossed the line—the threat to make the mechanics' lives "harder" by ramping up enforcement of company rules, denigration of the grievance process as futile, and the rhetorical threat to eat the kidney of any employee who "f***[ed] with" him. *Naperville*, 368 N.L.R.B. No. 3, at 3–4. In the context of a speech harshly critical of recent union activity, the threat to increase enforcement of company rules would reasonably be understood as threatening retaliation because of that activity.

*See*, *e.g.*, *Miller Indus. Towing Equip., Inc.*, 342 N.L.R.B. 1074, 1074 (2004). Moreover, because "filing and prosecution of employee grievances is a fundamental, day-to-day part of collective bargaining," *Laredo Packing Co.*, 254 N.L.R.B. 1, 4 (1981) (quoting *Crown Cent. Petroleum Corp. v. NLRB*, 430 F.2d 724, 729 (5th Cir. 1970)), it is an unfair labor practice to say that a "contractual grievance procedure" is "futile," *M.D. Miller Trucking & Topsoil, Inc.*, 361 N.L.R.B. 1225, 1225 (2014), which is what Laskaris did here. Naperville objects that section 8(c) allows employers to criticize the substance of individual grievances. But the Board faulted Laskaris for making clear that he would refuse to honor all grievance determinations, not for addressing the merits of any individual one. Finally, while the Board and the ALJ split on whether Laskaris's kidney comment reflected a threat of violence, the Board was clearly correct that, at a minimum, it would "reasonably tend to coerce employees in the exercise of their Section 7 rights." *Naperville*, 368 N.L.R.B. No. 3, at 4.

d

The Board found that Laskaris violated section 8(a)(1) on October 27, by telling Higgins that he did not want to employ any of the former strikers and that, if Higgins returned, "it would not be long before he was gone." *Naperville*, 368 N.L.R.B. No. 3, at 16; *see id.* at 1 n.2. Naperville attempts to cast the statement about Higgins as a lawful prediction about his commitment to the dealership. But that overlooks the context of the remark, which followed immediately after Laskaris's comment that he did not want to take back any of the striking mechanics. The Board thus had ample ground for concluding that Laskaris's comment was a threat of reprisal for Higgins' union activities.

2

The Board also found that Laskaris violated section 8(a)(1) by "warning" Bisbikis that "things would not be the same" if the employees went on strike. *Naperville*, 368 N.L.R.B. No. 3, at 1, 3; *see id.* at 8 (ALJ decision). The Board agreed with the ALJ's conclusion that, under the facts of this case, "the statement cannot be viewed as anything but a threat that a strike would produce only negative consequences for the unit." *Id.* at 3 (brackets omitted). Substantial evidence supports the Board's finding that Laskaris's statement was an unlawful threat.

On June 29, just a month before the union contract was set to expire, Bisbikis came into Laskaris's office seeking the rescission of a new policy requiring employees to pay for a portion of their uniforms' cost. *Naperville*, 368 N.L.R.B. No. 3, at 8. Laskaris rebuffed Bisbikis's demand. Turning the conversation to the company's ongoing labor negotiations with the union, Laskaris then told Bisbikis that "things would not be the same" if the mechanics chose to strike. *Id.*; *see also id.* at 3, 19–20.

The Board reasonably concluded on this record that Laskaris's statement was a threat rather than a mere prediction about the consequences of union activity. While an employer may "communicate to his employees any of his general views about unionism or any of his specific views about a particular union," and even predict "the precise effects he believes unionization will have on his company[,]" this does not give employers *carte blanche* to make threats against union activity under the guise of innocent prognostication. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969). Instead, the employer's comments must be "carefully phrased on the basis of objective fact to convey an employer's belief as to

demonstrably probable consequences[,]" and those consequences must be ones that are "beyond [the employer's] control[.]" *Id.*; *see also United Food & Com. Workers Union Loc. 204 v. NLRB*, 506 F.3d 1078, 1081 (D.C. Cir. 2007) (Employer predictions of adverse consequences must "rest on objective facts outside the employer's control[.]"); *General Elec. Co. v. NLRB*, 117 F.3d 627, 632 (D.C. Cir. 1997) ("We ask whether [the employer] based its predictions about the effect of unionization on objective facts about consequences beyond its control or whether its predictions were unrelated to economic necessity, thus amounting to [unlawful] threats of reprisal[.]") (citations omitted)).

Substantial evidence supported the Board's decision that Laskaris's words did not refer to adverse circumstances "outside the employer's control[,]" *United Food*, 506 F.3d at 1081, but instead implied that the dealership would make things worse for the mechanics after the strike. The record shows that Laskaris made the remark, without any qualification, after a union activist pressed his objection to a new workplace policy that required workers to pay part of the cost of their uniforms. Laskaris, in other words, chose to link the potential strike and its consequences to the discussion of an unpopular new employer-imposed policy. *Naperville*, 368 N.L.R.B. No. 3, at 8; J.A. 143. By linking his authority over the new uniform policy and the economic cost it imposed on employees with the adverse consequences that would come after a strike, Laskaris crossed the line from the innocent expression of a viewpoint to a threat. Or so the Board reasonably concluded. *Cf. United Food*, 506 F.3d at 1084 ("[I]t is the Board's duty, not ours, to focus on the question: What did the speaker intend and the listener understand?") (internal quotation marks and citations omitted)).

After all, the content and context of Laskaris's comment must be read in light of "the economic dependence of the employees on their employers"—especially when, as here, labor negotiations are underway. *Gissel Packing*, 395 U.S. at 617. Those circumstances made Bisbikis attuned to the "intended implications of the [employer] that might be more readily dismissed by a more disinterested ear." *Id*. Keep in mind that "the line between prediction and threat is a thin one," especially in the midst of difficult labor negotiations, "and in the field of labor relations that line is to be determined by context and the expertise of the Board." *Timsco Inc. v. NLRB*, 819 F.2d 1173, 1178 (D.C. Cir. 1987).

Given that record, Naperville and the dissenting opinion err in insisting that Laskaris's comment was too vague for the Board to find it a threat. *See* Pet. Br. 34–36; Dissenting Op. at 1–5. In support, the dissenting opinion offers a list of statements deemed non-threatening, without any explanation of their surrounding context. Dissenting Op. at 2. To be sure, considered in a factual vacuum, the claim that "things would not be the same" post-strike might not necessarily be an unlawful threat.

But here the law, like nature, abhors a vacuum. Contrary to the dissenting opinion's approach, there is no list of acceptable and unacceptable statements. Labor law does not categorize statements as permissible or impermissible based just on which words were used. Instead, words draw their meaning from context, and that case-specific context lends strong support to the Board's decision here. Specifically, Laskaris's comment about things changing arose within a tense conversation between the employer and a union activist over a disputed new policy that Laskaris's dealership had imposed, that Laskaris controlled, that economically burdened the workers, and that Laskaris insisted on continuing, all while

labor negotiations were ongoing. *See* J.A. 197–199. And it was Laskaris who connected the discussion over an unpopular employer-set working condition with ongoing labor negotiations and the threat of a strike. In light of the contentiousness of the dispute over an employment policy entirely within the employer's control and the course in which Laskaris took the discussion, the Board reasonably concluded that Laskaris was not predicting that a strike would improve conditions. Instead, by connecting the strike and a disfavored new policy that the dealership itself had imposed, the Board found as a matter of fact that Laskaris was implying that the employer could make conditions worse still. That hardly qualifies as "bland[,]" Dissenting Op. at 5.

The dissenting opinion says that the fact that Laskaris, rather than Bisbikis, testified to the content and unpopularity of the new uniform policy makes this context less revealing. Dissenting Op. at 4–5. If anything, Laskaris's testimony that the new policy was "big scuttlebutt" among the employees who "were all squawking" about it buttresses the Board's conclusions. J.A. 197–198.

The dissenting opinion then brushes off the notion that paying roughly $2 per work shirt could be a source of relevant upset. Dissenting Op. at 5. Suffice it to say that the workers whose paycheck got smaller time and again could reasonably look at the issue through a different economic lens.

In other words, on this record, the Board's finding that Laskaris's statement amounted to a threat and not just a prediction of economic consequences beyond his control passes muster under our "highly deferential" and "tightly cabined" standard of review. *Inova Health Sys. v. NLRB*, 795 F.3d 68, 73, 80 (D.C. Cir. 2015); *see, e.g.*, *Ebenezer Rail Car Servs., Inc.*, 333 N.L.R.B. 167, 167 n.2 (2001) (holding that

supervisor's statement to an employee that he would "regret this all year" was an unlawful threat when uttered "immediately after the announcement of the union election victory," given "the context and timing of [the] statement"). The only question before us, after all, is whether the Board's ruling "rest[s] upon reasonable inferences[.]" *Tasty Baking*, 254 F.3d at 125. The Board's decision here does, and so we cannot overturn it "simply because other reasonable inferences may also be drawn." *Id*.

The Board's decision also comports with its own precedent. In *Valmet, Inc.* the Board held that an employer violated the law when he told an employee that, if a union were formed, they could no longer have one-on-one conversations, and then added "[r]emember that I hired you." 367 N.L.R.B. No. 84, slip op. at 2 n.7 (Feb. 4, 2019). In the Board's words, the employer's warning that "things would change if the [u]nion came in," combined with his assertion of employment authority, constituted a threat. *Id*. So too here the Board found a threat when Laskaris combined an assertion of authority—his rejection of employees' request to rescind a newly adopted policy that hit them in their wallets—with a warning that things would change if the employees chose to strike. *Naperville*, 368 N.L.R.B. No. 3, at 3.

In so holding, we must decline the credit the dissenting opinion ascribes to us for the Board's reasoning. Dissenting Op. at 4–6. It was the Board's idea (correctly) to accord significance to the timing and setting of Laskaris's statement as a response to the conversation "Bisbikis initiated * * * about employee concerns." *Naperville*, 368 N.L.R.B. No. 3, at 3. The Board and the ALJ both found that Laskaris's comment "did not communicate any objective facts or predictions as to the effects of a potential strike," and under the circumstances could only be viewed as a threat. *Id*. (internal quotation marks

omitted); *see also id*. (citing *Valmet, Inc*., 367 N.L.R.B. No. 84, slip op. at 2 n.7). The ALJ, whose findings the Board here adopted, repeatedly noted the context for Laskaris's comment in explaining its conclusion that the statement was unlawful. *Id*. at 8, 17, 19–20 ("At this meeting, Laskaris rejected Bisbikis' proposal [to rescind the new uniform policy] and warned him that if the mechanics went on strike, 'things wouldn't be the same.'").[2]

The dissenting opinion also argues that, because the Board's decision places an instance of speech beyond the protection of the First Amendment, constitutional avoidance counsels in favor of setting aside the NLRB's decision regarding Laskaris's "things would not be the same" statement. Dissenting Op. at 5–6. That is incorrect for two reasons.

First, Naperville has never argued—to the administrative law judge, to the Board, or to this court—that finding Laskaris's statement to be an unfair labor practice implicates the First Amendment in any way. At a minimum, constitutional avoidance disfavors judges raising constitutional questions that the parties have not. Doubly so under the National Labor Relations Act that statutorily precludes us "from considering an objection that has not been urged before the Board, 'unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances[,]'" which are not present here. *Detroit Edison Co. v. NLRB*, 440

---

[2] The dissenting opinion adjures us to "make an independent examination of the whole record" in this case. Dissenting Op. at 5 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). So the dissenting opinion inconsistently faults us for being both too independent in our consideration of the whole record and not independent enough. *Compare* Dissenting Op. at 4, 5–6 *with* Dissenting Op. at 5. Our care to analyze whether the whole record substantiates the Board's decision cannot be both wrong and right.

U.S. 301, 311 n.10 (1979) (quoting 29 U.S.C. § 160(e)); *see also Sims v. Apfel*, 530 U.S. 103, 108 (2000); *U-Haul Co. of Nevada, Inc. v. NLRB*, 490 F.3d 957, 963 (D.C. Cir. 2007); *cf. Polynesian Cultural Ctr., Inc. v. NLRB*, 582 F.2d 467, 473 (9th Cir. 1978) (holding that raising First Amendment issue on judicial appeal was "too late" under 29 U.S.C. § 160(e)).

Second, under long-settled Supreme Court precedent, when an employer's prediction that negative consequences will arise from union activity contains the "implication" that the employer may of its own accord contribute to those consequences, the statement constitutes "a threat of retaliation * * * and as such [is] without the protection of the First Amendment." *Gissel Packing*, 395 U.S. at 618. That is this case.

B

Section 8(a)(3) of the NLRA makes it an unfair labor practice to discriminate in employment to "discourage membership" in a union. 29 U.S.C. § 158(a)(3). Employers violate this provision if they take "an adverse employment action in order to discourage union activity." *Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 104 (D.C. Cir. 2003). But the Board has held that an employee can lose section 8(a)(3)'s protection by confronting the employer in a sufficiently opprobrious manner. *See Kiewit Power Constr. Co. v. NLRB*, 652 F.3d 22, 26 (D.C. Cir. 2011). Here, the Board found that Naperville violated section 8(a)(3) by firing Bisbikis. *Naperville*, 368 N.L.R.B. No. 3, at 2. Naperville counters that Bisbikis lost the protection of the NLRA by calling Laskaris a "stupid jack off" after Laskaris cursed at him in the confrontation immediately preceding his termination.

After briefing was complete, the NLRB asked us to remand on this issue for reconsideration in light of its

intervening decision in *General Motors*. There, the Board held that mixed-motive terminations should be assessed under *Wright Line* rather than *Atlantic Steel*, 369 N.L.R.B. No. 127, slip op. at 1–2, and that this change should apply "retroactively to all pending cases," *id.* at 10.

We have "broad discretion to grant or deny an agency's motion to remand." *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018). An agency may obtain a remand without confessing error, so long as it genuinely intends "to reconsider, re-review or modify" its original decision. *Limnia, Inc. v. Dep't of Energy*, 857 F.3d 379, 387 (D.C. Cir. 2017). We consider whether the agency has provided a reasoned explanation for a remand, *see Clean Wis. v. EPA*, 964 F.3d 1145, 1175–76 (D.C. Cir. 2020), whether its motion is "frivolous or made in bad faith," *Util. Solid Waste*, 901 F.3d at 436, and whether granting the motion would "unduly prejudice the non-moving party," *id.*

Here, the Board has offered a reasonable ground for remand—so that it may apply *Wright Line* in the first instance. In *General Motors*, the Board explained its view that *Wright Line* should govern cases like this one.[3] In this case, the key question under *Wright Line* is whether Laskaris would have fired Bisbikis in the absence of his union activity. *See Novato Healthcare*, 916 F.3d at 1100–01. Because the Board did not address that question below, we remand for it to do so.

Other considerations also favor a remand. Naperville does not contend that the Board is acting in bad faith. Further, there

---

[3] *General Motors* reasoned that *Atlantic Steel* had produced inconsistent results and prevented employers from addressing genuinely abusive conduct, 369 N.L.R.B. No. 127, slip op. at 4–6 (July 21, 2020), and that the benefits of *Wright Line* warrant applying it retroactively, *id.* at 10–11.

is little reason to think that a remand would unduly prejudice Naperville. To the contrary, a remand would give the dealership an opportunity to argue why its discharge of Bisbikis was lawful, and to do so under a legal standard that the Board views as more favorable to employers. *See Gen. Motors*, 369 N.L.R.B. No. 127, at 5. A remand is also unlikely to burden Naperville with substantial litigation costs, as an ALJ has already found a violation under *Wright Line*, and Naperville has already briefed its opposition to that finding before the Board. *See Naperville*, 368 N.L.R.B. No. 3, at 19; Brief in Support of Exceptions at 11–13 (No. 13-CA-207245) (N.L.R.B. Aug. 31, 2018).

We thus remand for reconsideration on the question whether Naperville unlawfully discharged Bisbikis. In doing so, we take no position on whether the ALJ properly applied *Wright Line* or whether Naperville adequately preserved its objections before the Board.

C

Section 8(a)(5) of the NLRA makes it an unfair labor practice for an employer to "refuse to bargain collectively" with a union. 29 U.S.C. § 158(a)(5). Collective bargaining means conferring "in good faith with respect to wages, hours, and other terms and conditions of employment." *Id.* § 158(d). One mandatory subject of bargaining is union access to employees during work hours. *Ernst Home Ctrs., Inc.*, 308 N.L.R.B 848, 865 (1992). Employers cannot unilaterally change employment terms on such mandatory subjects without first "bargaining to impasse." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991).

Here, Naperville did just that. The successor collective-bargaining agreement, which applied to Naperville at all relevant times, granted the union access to the dealership to

adjust complaints individually or collectively. Before the strike, Thomas had visited the dealership about once every six weeks. Soon after the strike, Naperville barred both Thomas and Cicinelli from its premises and required other union representatives to request access before visiting the dealership. By restricting the mechanics' ability to communicate with the union, Naperville changed their terms and conditions of employment on a mandatory subject of bargaining. And it did so unilaterally, without any effort to bargain with the Union.

Naperville seeks to defend its conduct under *Republic Aviation Corp. v. NLRB*¸ 324 U.S. 793 (1945). Although that case recognized conditions in which an employer could ban union solicitation during working hours, *id.* at 803 & n.10, it never suggested that an employer could institute such a ban in the face of an operative bargaining agreement. We thus decline to set aside the Board's finding that Naperville violated sections 8(a)(1) and 8(a)(5).[4]

## IV

We remand the unlawful discharge claim for reconsideration, deny the petition for review in all other respects, and grant the Board's cross-application for enforcement in all other respects.

*So ordered.*

---

[4] Under our precedent, conduct that violates section 8(a)(5) also violates section 8(a)(1). *S. Nuclear Operating Co. v. NLRB*, 524 F.3d 1350, 1356 n.6 (D.C. Cir. 2008).

KATSAS, *Circuit Judge*, concurring in part and dissenting in part:  The National Labor Relations Board held that Frank Laskaris, the owner and president of Cadillac of Naperville, violated federal law by telling an employee that "things would not be the same" if Naperville employees went on strike. *Cadillac of Naperville, Inc.*, 368 N.L.R.B. No. 3, slip op. at 3 (June 12, 2019).  The Board further ordered Laskaris and the dealership to cease and desist from making similar statements in the future.  *Id.* at 4.  In my view, Laskaris's statement was protected speech as opposed to an unlawful threat of retaliation.

Section 8(a)(1) of the National Labor Relations Act makes it an unfair labor practice for employers to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by the Act.  29 U.S.C. § 158(a)(1).  But section 8(c) qualifies section 8(a)(1) with regard to speech.  It states that that the expression "of any views, argument, or opinion" is neither an unfair labor practice, nor even evidence of an unfair labor practice, "if such expression contains no threat of reprisal or force or promise of benefit."  *Id.* § 158(c).  Section 8(c) "protects speech by both unions and employers" and thus "'implements the First Amendment.'" *Chamber of Commerce v. Brown*, 554 U.S. 60, 67 (2008) (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969)).  Moreover, section 8(c) serves "to encourage free debate on issues dividing labor and management," *Linn v. United Plant Guard Workers*, 383 U.S. 53, 62 (1966), and "favor[s] uninhibited, robust, and wide-open debate in labor disputes," *Letter Carriers v. Austin*, 418 U.S. 264, 273 (1974).

Section 8(c) protects statements to the effect that union activity will harm employees by decreasing an employer's competitiveness.  In *Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130 (D.C. Cir. 1994), we explained that an employer may "say how the company is likely to respond to a changed economic environment," so long as its statements "imply no punitive or retaliatory purpose."  *Id.* at 1138.  For example, section 8(c)

protects speech "seeking to impugn" a union's "record on job security." *Id.* at 1133, 1140. It protects this statement: "We are against the Union because we know they can wreck the Company and reduce the number of jobs." *Id.* at 1144 (quoting *Laborers' Dist. Council of Ga. v. NLRB*, 501 F.2d 868, 872 n.11 (D.C. Cir. 1974)). It protects this statement: "Unions do not work in restaurants …. If the Union exists at [the restaurant] Shenanigans, Shenanigans will fail. That is it in a nutshell." *Id.* at 1145 (quoting *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1364 (7th Cir. 1983)). It also protects this one: "Please, don't let this outside union force you and your Company into a knock-down and drag-out fight!" *Flamingo Hilton-Laughlin v. NLRB*, 148 F.3d 1166, 1174 (D.C. Cir. 1998) (cleaned up). And this one: "A vote for the union would put us back to the bargaining table which is a long and expensive process, and who knows, we might wind [up] in another strike." *Id.* (cleaned up). Laskaris's unelaborated remark that "things would not be the same" after a strike is akin to these remarks, but notably tamer.

The Board cited its precedents, though not ours, on the line between protected speech and unprotected threats of retaliation. *Naperville*, 368 N.L.R.B. No. 3, at 3. Yet even the Board has held that statements like Laskaris's are "too vague and ambiguous" to constitute an unlawful threat. *Phoenix Glove Co.*, 268 N.L.R.B. 680, 680 n.3 (1984). For example, in *Phoenix Glove*, the Board held that a supervisor could permissibly say "that the employees did not need a union and that they would be 'messing up' if they got one." *Id.* Similarly, in *Ben Franklin Division of City Products Corp.*, 251 N.L.R.B. 1512 (1980), an employer stated that a union "'would just mess up the employees worse,'" and the Board concluded that the statement was "entirely too vague and ambiguous" to constitute an unfair labor practice. *Id.* at 1519. In contrast, the cases cited by the Board here involve facially threatening language. *See*

*Valmet, Inc.*, 367 N.L.R.B. No. 84, slip op. at 2 n.7 (Feb. 4, 2019) ("Remember that I hired you."); *Colonial Parking*, 363 N.L.R.B. No. 90, slip op. at 4 (Jan. 5, 2016) ("Up until now you and we were like family members, living in peace, in good terms. From now on, we are not going to continue the sentiment of family-ship."); *Ozburn-Hessey Logistics, LLC*, 357 N.L.R.B. 1456, 1490 (2011) (employer "told an employee that he did not want the employee to work" in the department "because of the employee's union activities" and "threatened her with an unspecified reprisal" if she disclosed the conversation); *F.W. Woolworth Co.*, 310 N.L.R.B. 1197, 1200 (1993) ("if they think that I'm a bitch now, wait").

The Board further reasoned that Laskaris's statement was unlawful because it did not "communicate any objective facts" about the likely effects of a strike. *Naperville*, 368 N.L.R.B. No. 3, at 3. This reasoning overreads a statement in *Gissel Packing* that when an employer predicts the "precise effects" of union activity, the prediction must rest on "objective fact." 395 U.S. at 618. A "precise" assertion of fact, if unsupported, could perhaps be unfairly misleading. But that concern does not cover the kind of open-ended language at issue here. We have thus held that section 8(c) protects "speculat[ion]" about the possible negative outcomes of unionization. *Flamingo Hilton-Laughlin*, 148 F.3d at 1174. Moreover, *Gissel Packing* itself stressed that "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board." 395 U.S. at 617. And because section 8(c) ensures "free debate on issues dividing labor and management," *Linn*, 383 U.S. at 62, we cannot leave unions "free to use the rhetoric of Mark Antony" while limiting employers "to that of a Federal Reserve Board chairman," *Crown Cork & Seal Co.*, 36 F.3d at 1140.

Finally, the Board reasoned that because Laskaris made retaliatory threats three to four months after the statement at issue, the mechanics likely understood the earlier statement as "a foreshadowing of worse to come." *Naperville*, 368 N.L.R.B. No. 3, at 3. But the lawfulness of any given statement turns on whether *it* has a "reasonable tendency to coerce or to interfere with" protected activity. *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001). Here, there was no reasonable connection between the first statement and later ones, in time or subject matter. Laskaris's June 2017 statement that "things would not be the same" did not reasonably foreshadow, say, his October 2017 threat to eat the kidney of a former striker. So the later statements cannot fairly be used to retroactively recharacterize the first one.

The administrative law judge reasoned that Laskaris's statement occurred "just before a strike." *Naperville*, 368 N.L.R.B. No. 3, at 17. That is a bit of an exaggeration; Laskaris made the statement on June 29, and the strike began on August 1. But in any event, the timing of the statement reveals nothing about whether it was an unlawful threat of retaliation. And because section 8(c) protects "wide-open debate in labor *disputes*," *Letter Carriers*, 418 U.S. at 273 (emphasis added), we cannot temper its application precisely when the disputes are becoming most acute.

My colleagues rest on a different theory. They contend that Laskaris's statement was threatening because it "arose within a tense conversation" about an "unpopular" policy that "burdened the workers"—namely, the requirement that employees "pay a portion of uniform costs." *Ante* at 15–16. Neither the Board nor the ALJ mentioned this consideration in their respective legal analyses. *See Naperville*, 368 N.L.R.B. No. 3, at 3 (Board); *id.* at 17 (ALJ). Nor did John Bisbikis, the employee to whom Laskaris spoke, even identify what the

policy was, much less connect it to any actual or perceived threat. J.A. 143 ("I initiated the meeting to discuss some issues that I was having in the shop, and after we talked about those issues, he started the conversation by saying that if we went on strike, things wouldn't be the same."). The policy itself was mentioned only by Laskaris, and it involved a requirement that employees pay half the wholesale cost of their work T-shirts, which was "about $2 per shirt." *Id.* at 197–98. In my judgment, that contextual consideration does not transform Laskaris's bland and ambiguous "things would not be the same" statement into a threat.

Deference cannot salvage the Board's decision. It is "firmly established" that the First Amendment, which section 8(c) implements, protects an "employer's free speech right to communicate his views to his employees." *Gissel Packing*, 395 U.S. at 617. Appellate courts must "make an independent examination of the whole record" in determining the scope of free speech protections. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up); *see, e.g., Peel v. Att'y Registration & Disciplinary Comm'n*, 496 U.S. 91, 108 (1990) (plurality opinion); *id.* at 111–17 (Marshall, J., concurring in the judgment); *Bose Corp. v. Consumers Union*, 466 U.S. 485, 508 (1984). Moreover, statutes must be interpreted to avoid serious constitutional questions—a rule often applied to determine the interplay between the NLRA and the First Amendment. *See, e.g., Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575–78 (1988); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 740–43 (1983); *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 499–507 (1979). So if it were a close question whether "things would not be the same" was an unlawful threat despite its vagueness, ambiguity, and anodyne tone, I would resolve the question in favor of speech rather than against it. Finally, even if deference were otherwise appropriate, as my colleagues

argue, we could not uphold the Board's decision on a rationale different from the ones given by the agency itself. *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943).

For these reasons, I would set aside the NLRB's determination that Laskaris committed an unfair labor practice in telling an employee that "things would not be the same" in the event of a strike. I agree with my colleagues that Laskaris's later statements were unprotected threats and that Naperville's other arguments lack merit. I therefore join the *per curiam* opinion except for Part III.A.2, from which I respectfully dissent.